#29223-a-MES
2021 S.D. 24

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                 Plaintiff and Appellee,

    v.

JONATHON W. KLINETOBE,                 Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE HEIDI LINNGREN
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

PAUL S. SWEDLUND
Assistant Attorney General
Pierre, South Dakota                   Attorneys for plaintiff and
                                       appellee.


ELIZABETH REGALADO of
Pennington County Public
   Defender's Office
Rapid City, South Dakota               Attorneys for defendant and
                                       appellant.

* * * *

ARGUED
JANUARY 12, 2021
OPINION FILED **04/14/21**

#29223

SALTER, Justice

[¶1.] Jonathon Klinetobe pled guilty to aiding and abetting first-degree manslaughter. Following a four-day sentencing hearing, the circuit court sentenced Klinetobe to life in prison without the possibility of parole. He appeals the sentence. We affirm.

**Facts and Procedural History**

[¶2.] Jonathon Klinetobe (Klinetobe) was in an on-again, off-again relationship with Jessica Rehfeld (Rehfeld) throughout 2014 and 2015. Both lived in Rapid City. Their relationship ultimately ended in April 2015. Klinetobe believed Rehfeld had been unfaithful and became unhappy after she eventually resumed a relationship with her ex-boyfriend. Klinetobe began a pattern of threatening phone calls, texts, and social media posts directed to Rehfeld. She obtained a temporary protection order against Klinetobe in May 2015 after Klinetobe physically assaulted her. On her protection order application, Rehfeld stated that she felt her "life is in danger."[1]

[¶3.] Klinetobe became increasingly angry after being served with the protection order and began discussing the possibility of having Rehfeld killed with Richard Hirth (Hirth) who, ironically, was a mutual friend. Hirth claimed to have previous, tangential connections to the Hells Angels Motorcycle Club. Klinetobe

---

1. Klinetobe's messages to Rehfeld were menacing and included the following examples: "I hate u get out of state w u can or kill yourself everyone is better off wit out u in their life go be . . . in hell;" "I'm done wit a skank like u u deserve to get beat and raped everyday;" "go kill yourself it would do the whole world some good you cheating slut;" "i am going to kill u and ur friends are next;" "Ur a dead bitch bring it."

used an entirely fabricated story to convince Hirth that the Hells Angels organization was offering an $80,000 bounty to whoever killed Rehfeld, allegedly because she possessed damaging information about the club. Klinetobe even arranged for Hirth to talk on the phone with a still-unknown individual posing as a Hells Angels member who confirmed that Rehfeld was the object of the $80,000 bounty. When Hirth asked about the "plan of action," the unidentified voice simply responded, "dead."

[¶4.] Hirth enlisted the assistance of a third man, Dave Schneider (Schneider), and the three confreres met several times to discuss Rehfeld's murder throughout late-April and early-May 2015. Because Rehfeld trusted Hirth, their plan called for him to pick her up at her home and drive her to her job at Walmart, ostensibly for her protection. However, rather than taking Rehfeld to work, Hirth would drive her to another location and kill her. Klinetobe, the group decided, would not be present because Rehfeld would not get into the vehicle if she saw him. Schneider was to serve as the driver. Klinetobe was anxious to carry out the plan and instructed Hirth to bring him Rehfeld's necklace coated with blood as proof of her death.

[¶5.] On May 18, 2015, Hirth and Schneider picked up Rehfeld from her home, purportedly to drive her to work. Rehfeld sat in the front passenger seat and Hirth sat in the backseat behind her. Schneider drove a "back route" to Walmart, telling Rehfeld it was to avoid being followed by Klinetobe. When they reached a deserted spot in the road, Hirth leaned forward, put his left hand over Rehfeld's mouth, and began stabbing her with a knife. Police reports included in Klinetobe's

presentence investigation indicate that Rehfeld struggled and bit down on Hirth's hand. As Rehfeld continued to struggle, he kept stabbing her. From the driver's seat, Schneider held Rehfeld's legs down to keep her from kicking. Rehfeld pleaded for her life while Hirth continued to stab her.

[¶6.]     Hirth later recalled in his interview with Rapid City police detectives that Rehfeld began to weaken as the attack continued. As her resistance waned, she looked up at Hirth and asked why this was happening to her. He recalled that she repeatedly told him, "I trusted you" and asked "why, why, why, why are you doing this, why, what have I done?" Near death, Rehfeld asked in vain if she could call her father. She then asked to roll down her window so she could look at the stars as she died. Hirth stabbed her in the neck again. Rehfeld died approximately twenty minutes after Hirth commenced the attack.

[¶7.]     Schneider and Hirth then removed Rehfeld's body from the vehicle and placed it in the trunk of the car using a military body bag. Hirth called Klinetobe to inform him that Rehfeld had been killed. Klinetobe reminded Hirth to bring him the necklace. Hirth insisted that Klinetobe help them dispose of Rehfeld's body because it had been Klinetobe's idea to kill her. Schneider and Hirth went to Klinetobe's trailer to pick him up. The three then drove into the Black Hills National Forest and selected a remote area near Rockerville where they dug a shallow grave using Hirth's military entrenching tool. Before burying Rehfeld, Klinetobe took her necklace, purse, wallet, cell phone, and Walmart employee identification tag.

[¶8.]     The three men agreed they would not tell law enforcement about the killing or about any of the circumstances surrounding Rehfeld's disappearance, death, and burial. They met on at least two subsequent occasions and renewed their commitment to keep quiet. The subject of the $80,000 bounty on Rehfeld's life was also a topic of discussion, but Klinetobe maintained his subterfuge and offered contrived excuses for why he was unable to pay Schneider and Hirth their share of the money.

[¶9.]     Klinetobe returned to Rehfeld's burial site several times. Because of a seizure disorder, he could not drive himself to the remote location and relied upon his friend, Beverly Cheshire (Cheshire), for rides. Cheshire knew Klinetobe had been involved in Rehfeld's disappearance and murder, and she understood that she was transporting him to the place where Rehfeld was buried. She later told police that Klinetobe had threatened that she "would be next" if she told anyone about his crime. In late May 2015, Klinetobe solicited the help of two other men, Michael Frye and Garland Brown, to rebury Rehfeld's body in a deeper grave nearby.

[¶10.]     Rehfeld's sudden disappearance went unresolved for the next year. During that time, Klinetobe feigned concern and ignorance regarding Rehfeld's whereabouts. He lied during an interview with a police detective and also lied to Rehfeld's family in an attempt to conceal his complicity and also to suggest Rehfeld's most recent boyfriend was responsible for her disappearance.

[¶11.]     Ultimately, however, Cheshire decided "she couldn't live with herself any longer" and reported what she knew about Rehfeld's murder to police in Newcastle, Wyoming, where she was then living. Newcastle police officers, in turn,

contacted their counterparts in Rapid City, and, with Cheshire's assistance, they quickly discovered Rehfeld's body. Rapid City officers also moved to locate and arrest Klinetobe, Hirth, and Schneider. While executing a search warrant at Klinetobe's house, detectives recovered Rehfeld's necklace, purse, and other articles taken from her body.

[¶12.] A Pennington County grand jury returned an indictment charging Klinetobe, Hirth, and Schneider with first-degree murder under a premeditated design theory or, alternatively, under a felony-murder theory. *See* SDCL 22-16-4(1)-(2). The indictment also charged the three men with conspiracy to commit first-degree murder, first-degree aggravated kidnapping, and conspiracy to commit first-degree aggravated kidnapping. *See* SDCL 22-3-8 (conspiracy); SDCL 22-19-1 (aggravated kidnapping in the first degree). The State initially provided notice of its intent to seek the death penalty but later withdrew its notice.

[¶13.] In September 2019, Klinetobe pled guilty to an information charging him with one count of aiding and abetting first-degree manslaughter. *See* SDCL 22-16-15 (first-degree manslaughter); SDCL 22-3-3 (aiding and abetting). The guilty plea was part of a written plea agreement with the State. Perhaps the most notable feature of the agreement was that it modified the statutory maximum sentence for the homicide offense. Instead of mandating a life sentence in the event of a murder conviction, the plea agreement authorized a guilty plea to first-degree manslaughter, which is punishable by an indeterminate sentence of up to life in prison. The provisions of the plea agreement made clear that the State intended to

seek the maximum penalty but allowed Klinetobe the opportunity to argue for a sentence that was less than life in prison.

[¶14.] As part of the plea agreement, the parties also executed and filed a separate factual basis statement. In it, Klinetobe specifically acknowledged that "[t]hroughout late April and early May" of 2015, he met with Hirth and Schneider and "discussed killing Jessica Rehfeld." Klinetobe admitted he "led Hirth and Schneider to believe they would be paid" as part of "a supposed Hells Angels bounty on Rehfeld's head which would be payable upon 'proof of death.'" The factual basis statement further related that "Klinetobe was aware of the plan to kill [Rehfeld] and when it would happen." According to the plan, "only Hirth and Schneider would be present at the killing[,]" and "Klinetobe would be called and join them after she was killed." Finally, the factual basis statement also confirmed the sequence of events following Rehfeld's killing, including her initial burial and Klinetobe's subsequent effort to exhume her body and rebury her.

[¶15.] After the completion of a presentence investigation, the circuit court conducted a four-day sentencing hearing in December 2019. The State presented testimony from a recently-retired Rapid City Police Department detective who described details concerning the investigation of Rehfeld's disappearance and death. The court also heard in-court victim impact statements and received several letters submitted by members of Rehfeld's family and her friends.

[¶16.] Much of Klinetobe's mitigation case focused on claims of intellectual disability and mental illness, along with his description of a traumatic childhood. His attorneys presented testimony from forensic psychologist Mark Cunningham,

Ph.D., and forensic psychiatrist Michael Farnsworth, M.D., along with testimony from Klinetobe's mother, sister, and stepfather.

[¶17.]	The expert testimony, related principally by Dr. Cunningham, suggested that multiple adverse developmental factors disrupted the "trajectory" of Klinetobe's life and left him less equipped to make sound decisions. These factors included prenatal exposure to alcohol, physical abuse and neglect in his childhood, cognitive limitations, and mental illness. In Dr. Cunningham's view, these "damaging or impairing factors" diminished Klinetobe's moral culpability.[2]

[¶18.]	Through testing, Dr. Cunningham opined that Klinetobe had a scaled intelligence quotient (IQ) of 70-75,[3] which Dr. Farnsworth characterized as "intellectually functioning . . . like an 11- or 12-year-old." Both experts concluded Klinetobe had a mild intellectual disability based upon his IQ and other cognitive

---

2.	The term "moral culpability" is most often used in capital cases to determine if a defendant or a class of defendants should be subject to the death penalty. For example, in *Atkins v. Virginia*, 536 U.S. 304, 306, 122 S. Ct. 2242, 2244, 153 L. Ed. 2d 335 (2002), the United States Supreme Court, using the parlance of the era, observed that mentally disabled individuals "do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." The Supreme Court ultimately held that imposing the death penalty upon those who are intellectually disabled violates the Eighth Amendment's prohibition upon cruel and unusual punishment.

3.	The State devotes a substantial portion of its brief to the claim that Klinetobe's IQ was actually higher than the value determined by Dr. Cunningham. Central to this factual argument is the State's claim that Dr. Cunningham improperly corrected for what is known as the "Flynn effect," which posits that IQ scores artificially drift higher over time. However, during the sentencing hearing, the State did not make this argument and appeared to accept the application of the Flynn effect correction. Further, as noted below, the circuit court did not, in any event, accept the more important aspects of Dr. Cunningham's testimony. Under the circumstances, we do not believe there to be a question before us that requires us to resolve the efficacy of correcting scaled IQ scores for the Flynn effect.

and behavioral deficits. As a result, Dr. Cunningham concluded Klinetobe had limited adaptive functioning skills, which Dr. Cunningham testified were illustrated by Klinetobe's poor employment record and history of financial dependence, poor hygiene, lack of initiative and performance, faulty decision-making, and an inclination to tell untrue stories. During his cross examination, Dr. Cunningham acknowledged that Klinetobe's concocted stories were often grandiose and tended to make Klinetobe appear powerful or estimable.

[¶19.] Following a recess, the circuit court provided a detailed explanation of its sentencing analysis by, among other things, referencing traditional sentencing factors, such as rehabilitation, retribution, and public safety. The court highlighted the evidence from the four-day sentencing hearing and specifically acknowledged Klinetobe was not responsible for the adverse circumstances of his childhood.[4] Although the court generally accepted the expert testimony at least insofar as the experts opined on Klinetobe's multiple "diagnoses[,]" the court ultimately found the expert testimony to be of little assistance.

[¶20.] In the court's view, the experts' opinions failed to adequately account for the nature and the extent of Klinetobe's planning and involvement in Rehfeld's murder and his subsequent ability to avoid detection for a year. The court explained that "it makes no sense to me that a man who is unable to focus long enough on his hygiene or his school work or his daily tasks could keep a murder covered [up] as long as [Klinetobe] did." In an apparent reference to his

---

4. The circuit court also found Klinetobe's minimal criminal history to be mitigating, though it noted that he had a "documented history" of mistreating women.

unfamiliarity with key pieces of information during cross examination, the court further found "it was clear . . . that [Dr. Farnsworth] was unaware in making his opinion of the extent of [Klinetobe's] planning[.]"

[¶21.]     Dr. Cunningham's testimony suffered from a similar lack of factual validation, the circuit court concluded. Though the court found "Dr. Cunningham's overall professional work to be credible," some of the historical facts upon which he based his theory that Klinetobe had reduced moral culpability were ultimately not established. In this regard, the court credited testimony from Klinetobe's mother and sister who provided a less stark assessment of the level of violence to which Klinetobe was exposed while growing up. In the court's view, this testimony "minimized the violence in [Klinetobe's] home, violence and incidents that Dr. Cunningham relied on." The court also found that Klinetobe's mother and sister described a broader range of Klinetobe's emotions and affect than Dr. Cunningham had contemplated, including Klinetobe's ability to express remorse and pursue reconciliation after doing something that hurt another, despite the fact, the court added parenthetically, he did not demonstrate genuine remorse for Rehfeld's killing.

[¶22.]     The balance of Dr. Cunningham's testimony was, in the circuit court's view, not mitigating–but aggravating. The court noted that Dr. Cunningham's exhaustive exposition of Klinetobe's "deficiencies, dismal past and the future of uncertainty that lies ahead" was not reassuring. The court explained:

> Although [Dr. Cunningham's] testimony would have been very
> effective to dissuade a jury to sentence [Klinetobe] to death, as
> he was originally hired, his testimony only persuaded this Court
> of the difficulties that [Klinetobe] would have, making [him] a
> real threat to the community.

[¶23.]     The circuit court further found there was a paucity of evidence to establish Klinetobe would be amenable to successful rehabilitation efforts, commenting that "[t]here has been no plan or suggestion of any detail to this Court as to what rehabilitation would look like." Beyond this, the court commented that Dr. Cunningham testified that Klinetobe's likelihood of success in the event of release or parole from prison could not be determined now, but would have to wait years into the future. The court also referenced testimony from Dr. Farnsworth during his cross-examination, in which he acknowledged that the principal traits which were at the heart of Klinetobe's criminal conduct will not be resolved through treatment.

[¶24.]     In the end, the circuit court concluded Klinetobe presented an acute risk to public safety. Without some assurance that Klinetobe could successfully address the issues that led him to seek Rehfeld's murder, the court determined that "no one is safe" and imposed a sentence of life in prison without the possibility of parole.

[¶25.]     Klinetobe appeals his sentence and presents the following issues for our review:

> 1.     Whether the circuit court abused its discretion by sentencing Klinetobe to life in prison without the possibility of parole.
>
> 2.     Whether the circuit court's sentence amounted to cruel and unusual punishment in violation of the Eighth Amendment.

## Standard of Review

[¶26.]    We generally review a circuit court's sentencing decision for an abuse of discretion. *State v. Holler*, 2020 S.D. 28, ¶ 10, 944 N.W.2d 339, 342. "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Id.* (quoting *State v. Delehoy*, 2019 S.D. 30, ¶ 22, 929 N.W.2d 103, 109). "This Court, in turn, will not overturn the circuit court's abuse of discretion unless that 'error is demonstrated and shown to be prejudicial error.'" *State v. Berget*, 2014 S.D. 61, ¶ 13, 853 N.W.2d 45, 52 (quoting *State v. Smith,* 1999 S.D. 83, ¶ 39, 599 N.W.2d 344, 353).

[¶27.]    Whether a circuit court's sentence violates the Eighth Amendment's proscription against cruel or unusual punishment involves a different standard. *Holler*, 2020 S.D. 28, ¶ 10, 944 N.W.2d at 342. We review this constitutional question de novo. *Id.*

## Analysis and Decision

### *Abuse of Discretion*

[¶28.]    "Circuit courts have broad discretion in sentencing." *Id.* ¶ 17. Courts should consider the traditional sentencing factors of retribution, deterrence—both individual and general—rehabilitation, and incapacitation. *See State v. Pulfrey*, 1996 S.D. 54, ¶ 15, 548 N.W.2d 34, 38. When considering these sentencing factors, "[o]ne . . . is not preeminent over any of the others." *Id.* The factors are to be weighed "on a case-by-case basis" depending on the circumstances of the particular case. *State v. Toavs*, 2017 S.D. 93, ¶ 10, 906 N.W.2d 354, 357. *See also State v.*

*Talla*, 2017 S.D. 34, ¶ 14, 897 N.W.2d 351, 355 (holding that circuit courts weigh the relative importance of the penological goals of retribution, deterrence, incapacitation, and rehabilitation on a case-by-case basis).

[¶29.] "In order to determine the appropriate sentence, the sentencing court should acquire a thorough acquaintance with the character and history of the man before it." *Holler*, 2020 S.D. 28, ¶ 18, 944 N.W.2d at 344 (quoting *State v. McKinney*, 2005 S.D. 74, ¶ 17, 699 N.W.2d 460, 466). The sentencing court should have access to "the fullest information possible concerning the defendant's life and characteristics. Information which should be available to the court includes general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record." *Id.* (quoting *State v. Arabie*, 2003 S.D. 57, ¶ 21, 663 N.W.2d 250, 257).

[¶30.] Here, the circuit court did not abuse its discretion. The record shows that the circuit court carefully considered the evidence from the four-day sentencing hearing and appropriately weighed the sentencing factors. In its oral sentencing analysis, the court described and considered the factors in the context of this unique sentencing record, demonstrating a keen familiarity with Klinetobe himself and the entirety of the evidence adduced over the course of the lengthy sentencing hearing.

[¶31.] For example, the court found multiple areas of mitigating evidence, including Klinetobe's relatively young age, minimal criminal history, his guilty plea, and personal childhood trauma. The court specifically stated that Klinetobe's guilty plea saved Rehfeld's family the pain of a trial, and the court also expressed its awareness of the challenges Klinetobe faced growing up. However, the court

determined that aggravating factors weighed in favor of a harsher sentence, including Klinetobe's solicitation of others to assist in Rehfeld's murder, the lies he told to his accomplices, the manner of Rehfeld's death, his efforts to cover up the crime, and his lack of remorse. Klinetobe's strategy to minimize the impact of this evidence, though perhaps reasonable, was simply not successful.

[¶32.] In this regard, the circuit court was largely unpersuaded by the expert testimony, finding the opinions about moral culpability and the level of Klinetobe's intellectual disability to be unconvincing. Although the court acknowledged that Drs. Cunningham and Farnsworth appeared to be qualified experts, it found significant flaws in their conclusions based upon the court's own determination of important predicate facts.

[¶33.] In the court's view, Dr. Cunningham's opinions regarding Klinetobe's moral culpability were weakened by testimony from Klinetobe's mother and sister describing Klinetobe as being capable of remorse and showing empathy throughout his childhood. Further, the court determined that Dr. Farnsworth's lack of familiarity with the details of Rehfeld's murder and the extent of Klinetobe's involvement diminished the effectiveness of his opinions. These determinations are supported by the record.

[¶34.] Despite the evidence of Klinetobe's intellectual disability and limited adaptive functioning, the fact remains that he alone conceived the idea to kill Rehfeld and fabricated a story to successfully convince others to help him commit the most serious crime known to society. He constructed his bounty ruse so carefully that he arranged for a different individual to pose as a Hells Angels

member and speak to Hirth on the telephone to confirm the details. Investigators have never apprehended the Hells Angels poseur.

[¶35.] After Rehfeld had been killed, Klinetobe put off paying Hirth and Schneider with more deception. He lied to police and Rehfeld's family to avoid detection for the next year, despite the fact that the police were aware of Rehfeld's protection order against Klinetobe, his history of abusing her, and his threats. Paired with Klinetobe's lack of remorse,[5] these circumstances support the court's finding that his crime reflected careful planning and included his direct involvement as a necessary component. The court surely was not obligated to indiscriminately accept the expert testimony wholesale and find that Rehfeld's murder was the inevitable result of adverse circumstances beyond Klinetobe's control. *See State v. Jensen*, 1998 S.D. 52, ¶ 54, 579 N.W.2d 613, 622 (citation omitted) ("Of course, the mere fact that an expert testifies does not mean that his or her opinion must be accepted by the trial court. A trial court, when also sitting as the fact finder, is the sole judge of the credibility of the witnesses and can accept or reject all or part of the expert's testimony."); *see also Podio v. American Colloid Co.*, 83 S.D. 528, 532, 162 N.W.2d 385, 387 (1968) (citation omitted) ("The value of an opinion of an expert witness is dependent on and entitled to no more weight than the facts upon which it is predicated.").

---

5. Klinetobe argues the circuit court overlooked his brief statement during allocution that he "was truly sorry" to Rehfeld's family and to his own family and would accept "[w]hatever sentence I get." We believe the court was in the best position to judge Klinetobe's sincerity, and we are not inclined to revisit the court's lack-of-remorse determination in this appeal.

[¶36.] Nor can we accept Klinetobe's argument that the circuit court focused inordinately on the aggravated nature of the crime. Because the plea agreement allowed Klinetobe to plead guilty to the less serious homicide offense of first-degree manslaughter under an aider and abettor theory, the court acted within its discretion to accurately assess his level of culpability and the true nature of the offense.[6] For example, in addition to the other details of the crime described above, the court discussed the terror Klinetobe inflicted on Rehfeld leading up to her murder and the pain she suffered during the attack.

[¶37.] The court also noted that evidence relating to Klinetobe's potential for rehabilitation was comparatively weak. Although Drs. Cunningham and Farnsworth had thoroughly detailed Klinetobe's learning difficulties and mental health challenges, they did so in such stark terms that the court could reasonably find, as it did, that Klinetobe's chance of rehabilitation appeared "slim, if not nonexistent." The court noted, in this regard, that there was no plan or suggestion for Klinetobe's rehabilitation and a life outside of prison. In fact, Dr. Farnsworth testified that there is no treatment for the traits that played a central role in Rehfeld's death, including Klinetobe's grandiose behavior, his inclination to fabricate and lie, and his ability to persuade others to commit criminal acts for him.

---

6. The circuit court's evaluation was not limited to the information contained within the parties' factual basis statement. It was free to also rely upon the extensive sentencing record the parties subsequently developed. *See Holler*, 2020 S.D. 28, ¶ 18, 944 N.W.2d at 344 (quoting *Arabie*, 2003 S.D. 57, ¶ 21, 663 N.W.2d at 257) ("The court looks at a broad range of evidence . . . [and] 'may exercise wide discretion with respect to the type of information used as well as its source.'").

[¶38.]    The circuit court also considered the sentencing factor relating to incapacitation, explaining that Klinetobe represented a significant risk to public safety. Given Klinetobe's explosive violence and history of lashing out when he does not get his way, along with the abysmal way he had treated women,[7] the court concluded that "unless and until" Klinetobe gets his behavior under control, "no one is safe." We believe the court's comments were supported by the sentencing record and reflect a sound exercise of discretion.

[¶39.]    Klinetobe also argues that his intellectual deficits and mental illness should have justified a shorter sentence than Hirth and Schneider, but this argument is not sustainable. A claim of unwarranted sentencing disparity depends upon a record that establishes that co-defendants were similarly situated and inexplicably received different sentences. *See State v. Rice*, 2016 S.D. 18, ¶ 25, 877 N.W.2d 75, 83 (holding that a defendant seeking to prevail on a claim of unwarranted sentencing disparity "must show that his and [his co-defendant's] 'past records, demeanor, degree of criminal involvement, etc., are sufficiently similar as to cause the sentence disparity between them to be unjust'") (quoting *State v. Garber*, 2004 S.D. 2, ¶ 32, 674 N.W.2d 320, 328)).

[¶40.]    Here, there is an insufficient record to support such a claim. Hirth's case remains unresolved, and it appears Schneider had not been sentenced at the

---

7.    The record shows Klinetobe continued to threaten and abuse women after Rehfeld's death, prompting four women to seek protection orders during the year after Rehfeld's disappearance. Included among these women was another of Klinetobe's ex-girlfriends and the mother of his newborn child. Dr. Cunningham also testified that Klinetobe was "easily angered" and "aggressive towards females, especially mom."

time of Klinetobe's sentencing. As a result, Schneider's sentencing record is not included in the record before us, and though Klinetobe advises that Schneider ultimately received a 75-year prison sentence, this does not establish a sufficient record to review the issue.[8]

[¶41.] Under the particular facts presented here, we can find no abuse of discretion. The record indicates the court understood all of Klinetobe's mitigating evidence and gave it the proper weight. Indeed, the mere presence of mitigating evidence does not entitle a defendant to a diminished sentence, but rather forms a part of the larger sentencing record, all of which the sentencing court must consider. In our view, the circuit court considered all the recognized sentencing factors and appropriately weighed them as part of a "reasoned, careful and informed review of the defendant and his crime . . . ." *McKinney*, 2005 S.D. 74, ¶ 24, 699 N.W.2d at 467.

***Eighth Amendment***

[¶42.] "The Eighth Amendment to the U.S. Constitution, which was extended to the states through the Fourteenth Amendment, prohibits the infliction of 'cruel

---

8. Klinetobe's unwarranted sentencing disparity argument proceeds under the premise that Schneider's sentence represents the correct baseline sentencing measure. However, this assumption may not be safe. Trial courts in South Dakota generally impose indeterminate sentences that are the product of the court's discretion, not a determinate sentencing guideline system that assigns fixed sentencing ranges to guide the court's discretion. Therefore, all that can be said of Schneider's sentence is that it is different than Klinetobe's. This fact alone cannot establish it as a bellwether for the exercise of the circuit court's discretion in this case. *See Apprendi v. New Jersey*, 530 U.S. 466, 549, 120 S. Ct. 2348, 2394, 147 L. Ed. 2d 435 (2000) (O'Connor, J., dissenting) ("Studies of indeterminate-sentencing schemes found that similarly situated defendants often received widely disparate sentences.").

and unusual punishments.'" *State v. Taylor*, 2020 S.D. 48, ¶ 53, 948 N.W.2d 342, 357 (quoting *State v. Chipps*, 2016 S.D. 8, ¶ 32, 874 N.W.2d 475, 486). When this Court reviews sentences challenged under the Eighth Amendment, we are to "determine whether the sentence imposed is grossly disproportionate to its corresponding offense." *Id.* (quoting *State v. Yeager*, 2019 S.D. 12, ¶ 4, 925 N.W.2d 105, 108). The inquiry requires us to first compare "the gravity of the offense and the harshness of the penalty." *Id.* (quoting *Chipps*, 2016 S.D. 8, ¶ 38, 874 N.W.2d at 488). "Such a comparison 'rarely leads to an inference of gross disproportionality and typically marks the end of our review.'" *Id.* However, "[i]f an appearance of gross disproportionality results after the initial comparison of the gravity of the offense against the harshness of the penalty, only then will we compare [the defendant's] sentence to those imposed on other criminals for the same crime within or, if necessary, outside the jurisdiction." *State v. Diaz*, 2016 S.D. 78, ¶ 51, 887 N.W.2d 751, 766 (citation omitted).

[¶43.]     Here, Klinetobe's life sentence was the maximum allowed for the offense of aiding and abetting first-degree manslaughter. It is, of course, one of the most serious sentences a court can impose. *See Bult v. Leapley*, 507 N.W.2d 325, 327 (S.D. 1993) ("[A] life sentence is exceeded in severity only by capital punishment."). However, the gravity of Klinetobe's offense is difficult to overstate. Although the plea agreement allowed him to plead guilty to aiding and abetting first-degree manslaughter, the undisputed facts establish Klinetobe as a principal leader in what became a plot to kill Rehfeld, conceal her body, and avoid detection. Though this effort was not formally denominated as a conspiracy to commit first-

degree murder, it was, at a minimum, among the most serious types of manslaughter. *See Talla*, 2017 S.D. 34, ¶ 10, 897 N.W.2d at 354 (quoting *Rice*, 2016 S.D. 18, ¶ 24, 877 N.W.2d at 83) ("[W]hen a judge imposes the maximum sentence permitted by statute . . ., it is sufficient that the judge could reasonably conclude the offense in question is among 'the more serious commissions of the crime[.]'").

[¶44.] We conclude that Klinetobe has failed to show his sentence is grossly disproportionate and adhere to our general rule that "a sentence within the statutory maximum generally will not be disturbed on appeal." *Rice*, 2016 S.D. 18, ¶ 23, 877 N.W.2d at 83 (quoting *State v. Bruce*, 2011 S.D. 14, ¶ 28, 796 N.W.2d 397, 406). Under the circumstances, we need not compare the sentence to those imposed on other criminals for the same crime.

## Conclusion

[¶45.] Klinetobe's sentence of life without parole reflects neither an abuse of the sentencing court's discretion nor gross disproportionality. We affirm the sentence.

[¶46.] JENSEN, Chief Justice, and DEVANEY and MYREN, Justices, and CLARK, Circuit Court Judge, concur.

[¶47.] CLARK, Circuit Court Judge, sitting for KERN, Justice, disqualified.