#30974-aff in pt & rev in pt-SRJ
**2026 S.D. 9**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

CHADWICK A. JANES,                        Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MARK BARNETT
Retired Judge

* * * *

NICOLE J. LAUGHLIN
Sioux Falls, South Dakota                 Attorney for defendant and
                                          appellant.


MARTY J. JACKLEY
Attorney General

ANGELA R. SHUTE
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff and
                                          appellee.

* * * *

CONSIDERED ON BRIEFS
JANUARY 12, 2026
OPINION FILED **02/18/26**

#30974

JENSEN, Chief Justice

[¶1.]     Chadwick Janes was convicted of abuse or cruelty to a minor involving his stepchild, B.S.  On appeal, he argues the circuit court committed plain error by allowing the admission of a forensic interview and a supplemental report as evidence, portions of which he claims included inadmissible hearsay and other act evidence.  Janes also argues the circuit court abused its discretion in its sentencing and restitution order and asserts he was denied his Sixth Amendment right to effective assistance of counsel.  We affirm in part, reverse in part, and remand.

## Factual and Procedural History

[¶2.]     In 2019, Janes and Tanya were married and moved to a home together in Colton, South Dakota.  Tanya had two children from a prior marriage who also lived in the home—B.S., born in 2010, and N.S., born in 2011.  Janes and Tanya's child J.J., born in 2019, also lived in the home.  Janes's two children from a prior marriage—B.J. and A.J.—lived in the home half of the time pursuant to a shared parenting arrangement with the children's biological mother.

[¶3.]     In 2023, Janes and Tanya began contemplating divorce.  In April, Tanya moved to Brandon, South Dakota, with B.S., N.S., and J.J.  Janes served Tanya with divorce papers on May 16, 2023.  That night, N.S.'s grandmother (Grandmother) drove N.S. to a school concert while Tanya drove B.S in a separate car.  In their respective cars on the way to the concert, N.S. reported to Grandmother, and B.S. simultaneously reported to Tanya, that Janes physically abused N.S. and B.S. when they lived in Colton.  After arriving at the concert, Grandmother told Tanya that she needed to call the police about the incidents.

-1-

Tanya called law enforcement the next day. Law enforcement made a referral to Child's Voice, a child advocacy center.

[¶4.]     On June 6, 2023, B.S. was interviewed at Child's Voice by forensic interviewer Rin Calderon. B.S. was 13 years old at the time of the interview. B.S. told the interviewer that Janes beat him with a belt more than one time on his buttocks and thighs. Additionally, B.S. reported that Janes once pushed him into the kitchen cupboard, causing B.S.'s head to hit the cupboard, and choked him to the point that he could not breathe.

[¶5.]     N.S. was interviewed by Calderon at Child's Voice on June 26, 2023. The interview of N.S. was video recorded (Interview). N.S. was 12 years old at the time of her interview. N.S. reported that Janes hit her on her lower back with a belt more than one time and that Janes would grab N.S. and drag her around by the arm, hand, or wrist. Additionally, N.S. stated that she saw Janes spank B.S. with a belt more than one time and that it would leave red marks, bruises, or tiny scars. N.S. also reported that Janes would slam B.S.'s head into countertops and cabinets and that Janes once choked B.S. with his hands to the point that B.S. looked like he was going to pass out. N.S. further reported that Janes pushed J.J., dragged him by his ear, and spanked him and that J.J. had bruises and red marks. N.S. also reported that Janes once grabbed a child at a party by the ear, turning the child's ear red. Child's Voice prepared a report summarizing the interviews of both B.S. and N.S. (Report).

[¶6.]     On August 16, 2023, the State filed a three-count indictment against Janes. Count 1 charged aggravated assault and involved the alleged choking of B.S.

Counts 2 and 3 charged abuse or cruelty to a minor aged seven or above. Counts 1 and 3 were charged in the alternative. The State dismissed count 2 prior to trial.

[¶7.] The State filed pretrial notices seeking to introduce certain evidence at trial. The first notice sought to offer hearsay statements made by N.S. to Tanya, Grandmother, and Calderon. The second notice sought to offer other act evidence.

[¶8.] Following hearings on the notices, the circuit court referenced four separate hearsay statements of N.S. in its ruling: (1) Janes choking B.S.; (2) Janes hitting B.S. with a belt; (3) Janes spanking N.S.; and (4) bruising on J.J. The circuit court held these statements made by N.S. to Tanya, Grandmother, and Calderon would be admissible under the SDCL 19-19-806.1 hearsay exception if N.S. testified at trial, finding the statements to have sufficient indicia of reliability. The court explicitly included all the statements that N.S. made to Calderon during the Interview in this ruling.

[¶9.] The circuit court also considered the admissibility of the following other act evidence provided in the Interview and Report: (1) testimony that Janes once became angry with B.S. for not eating his green beans and poured a can of green beans on B.S.'s head (the green bean incident) and (2) testimony that Janes spanked B.S. with a "belt more than one time, leaving red marks, bruising or tiny scars" and that Janes "hit B.S. with the back of his hand, push[ed] and drag[ged] B.S. around with his hands, and slam[med] B.S.'s head into countertops and cabinets" (the belt incidents). The circuit court held the green bean incident was irrelevant, but found the belt incidents were admissible under SDCL 19-19-404(b) "to indicate motive, opportunity, plan, and absence of mistake."

[¶10.]     At trial, in addition to the testimony of N.S., Calderon, Grandmother, and B.S., the State also introduced the entirety of N.S.'s Interview and the Report— which summarized both interviews—without objection. The Report contained a reference to the green bean incident that was ruled inadmissible at the pretrial hearing. The Report also contained statements made by B.S. about his abuse by Janes. Additionally, the Interview and Report each contained other act evidence from N.S. regarding abuse of N.S., J.J., and a child at a party. None of this evidence was considered by the circuit court in its pretrial ruling, and because Janes did not object to the admission of the Interview and Report, the circuit court did not rule on the admissibility of this evidence.

[¶11.]     The jury found Janes not guilty of aggravated assault, but guilty of abuse or neglect of a child. The court ordered a presentence investigation report prior to sentencing. Janes was sentenced to ten years in the state penitentiary with three years suspended. The circuit court also orally ordered restitution of $2,000 for Tanya's lost wages and restitution for any future counseling costs for B.S., N.S., and J.J. The restitution order for counseling costs was not included in the court's written judgment of conviction.

[¶12.]     Janes appeals, raising several issues which we restate as follows:

1.    Whether the circuit court plainly erred by admitting hearsay statements and other act evidence contained in the Interview and Report.

2.    Whether the circuit court abused its discretion by sentencing Janes to ten years with three years suspended.

3.    Whether the circuit court abused its discretion by imposing restitution for future counseling expenses of the children and Tanya's lost wages.

-4-

4.     Whether Janes was denied his Sixth Amendment right to effective assistance of counsel.

## Analysis

### *Evidentiary issues*

[¶13.]     Normally, "[w]e review a circuit court's decision to admit other act evidence for an abuse of discretion." *State v. Bordeaux*, 2025 S.D. 55, ¶ 45, 27 N.W.3d 45, 56 (citation omitted).  But Janes does not challenge the circuit court's pretrial rulings admitting certain hearsay statements and other act evidence of N.S. Instead, he argues portions of the Interview and Report contained inadmissible hearsay of B.S. and other act evidence from N.S. that the circuit court either did not address or determined to be inadmissible in its pretrial ruling.

[¶14.]     Janes acknowledges that he did not preserve objection to this evidence at trial but asks that we review the evidentiary issues for plain error.  "This Court reviews unpreserved issues for plain error." *State v. Guziak*, 2021 S.D. 68, ¶ 10, 968 N.W.2d 196, 200 (citations omitted).  "To demonstrate plain error, [the appellant] must establish that there was: '(1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings.'" *Id.* (citations omitted).

[¶15.]     "Not every error that occurs during trial constitutes plain error; therefore[,] the plain error analysis 'must be applied cautiously and only in exceptional circumstances.'" *State v. McMillen*, 2019 S.D. 40, ¶ 25, 931 N.W.2d 725, 733 (citations omitted).  "[Plain error] is permissive, not mandatory.  If the forfeited error is 'plain' and 'affects substantial rights,' the court of appeals has authority to

order correction but is not required to do so." *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 735 (1993)).

[¶16.] Janes raises four issues regarding the admission of evidence that was included in the Interview and Report admitted during trial. First, Janes argues the green bean incident referenced in the Report was inadmissible because the circuit court excluded it in its pretrial ruling. Second, Janes contends the summary of B.S.'s disclosures of abuse included in the Report was inadmissible under SDCL 19-19-806.1 because B.S. was 13 years old at the time of disclosure and no other hearsay exception applied. Third, Janes argues the Interview and Report contained other act evidence involving N.S. that the circuit court did not consider in its pretrial ruling. Finally, Janes challenges the other act evidence involving J.J. and another child at a party contained in the Interview and Report.

[¶17.] Based upon a review of the record, we need not determine whether the admission of any of this evidence was error or plain error because Janes has not established that this evidence affected his substantial rights under the third prong for plain error review. To prevail on this prong, a defendant "must show that the error "affected the outcome of the proceedings[.]" *Guziak*, 2021 S.D. 68, ¶ 21, 968 N.W.2d at 202 (citations omitted). "'Prejudice' in the context of plain error requires a showing of a 'reasonable probability' that, but for the error, the result of the proceeding would have been different." *Id.* ¶ 21, 968 N.W.2d at 202–03 (citations omitted).

[¶18.] As for the green bean incident, the State did not elicit any testimony at trial regarding that incident aside from the brief reference to it in the Report. Nor

did the State reference the green bean incident during opening or closing statements or at any other time during the trial. We cannot say there is a reasonable probability that the result of the proceeding would have been different if the incident was not in the Report.

[¶19.]    Regarding the summary of B.S.'s claims of abuse by Janes, the Report contained the following hearsay statements from B.S.:

> During [B.S.]'s forensic interview, [B.S.] disclosed [Janes] beat [B.S.] with a belt more than one time on [B.S.]'s butt and thighs, the first time being when [B.S.] was 10-years-old and last time when [B.S.] was 13-years-old. [B.S.] stated [B.S.] saw red marks on [B.S.]'s thighs after [Janes] beat with a belt. [B.S.] disclosed [Janes] would "thrash," showing the interviewer a back and forth motion, [B.S.] around more than one time. [B.S.] stated one time [Janes] pushed [B.S.] with [Janes]'s hands into the kitchen cupboard and [B.S.]'s head hit the cupboard. [B.S.] stated [Janes] then choked [B.S.]'s neck and [B.S.] could not breathe. [B.S.] stated after [Janes] choked [B.S.], [B.S.] went downstairs and cried. [B.S.] stated [Janes] came downstairs and [Janes] called [B.S.] a little pussy and [B.S.] was terrified to say something.

[¶20.]    At trial, B.S. testified without objection that Janes would punish him by hitting him with a belt on his buttocks, legs, and back. B.S. testified that this occurred for approximately 2 1/2 to 3 years. Additionally, B.S. testified that on one occasion, Janes chased B.S. around the kitchen, pushed him against the cabinets, and choked his neck to the point that it was difficult to breathe. B.S. also testified that after the choking incident, he ran downstairs and laid on the couch and cried. B.S. testified that Janes later came downstairs and called him a pussy for crying after being choked. B.S. was also cross-examined by the defense about this testimony. The acts described by B.S. in his trial testimony were nearly identical to the statements of B.S. referenced in the Report about his abuse by Janes. On this

record, we cannot say there is a reasonable probability that, but for the error, the result of the proceeding would have been different.

[¶21.]     Similarly, the other act evidence regarding the abuse of N.S. contained in the Interview and Report was not prejudicial based upon N.S.'s trial testimony. The Interview and Report provided the following other act evidence regarding the abuse of N.S. by Janes:

> [N.S.] disclosed stepdad [Janes] hit [N.S.]'s lower back with a belt more than one time and that it would hurt and she would sometimes see little red spots.  [N.S.] disclosed [Janes] grabbed [N.S.] by [N.S.]'s arm, hand, or wrist and [Janes] would drag [N.S.] around.  [N.S.] disclosed [Janes] pushed with [Janes]'s hands on [N.S.]'s upper arm to move [N.S.] around and sometimes [N.S.] would fall over.

N.S. testified at trial to these same acts by Janes without objection.

[¶22.]     For many of the same reasons, we conclude Janes has not established prejudice concerning the other act evidence provided by N.S. regarding the abuse of J.J. and another child.  The Report provided:

> [N.S.] stated [N.S.] saw [Janes] drag [J.J.] by [J.J.]'s hands or by [J.J.]'s ear more than one time.  [N.S.] stated one time [Janes] pushed [J.J.] with [Janes]'s hand.  [N.S.] stated [Janes] pushed [J.J.] and [N.S.] saw bruises on [J.J.]'s back and side.  [N.S.] stated [Janes] spanked [J.J.] with [Janes]'s hand and [N.S.] saw little red marks.

Additionally, N.S. stated in the Interview and Report, "[Janes] grabbed . . . a kid at a party[] by the ear because [the kid] was running around the house and [N.S.] reported [the kid]'s ear was red."  These acts are similar to much of the other testimony of abuse at trial.  Moreover, aside from the brief reference in the Report, this evidence was not referenced again during the trial.

[¶23.] Even if we were to conclude that it was plain error for the circuit court to fail to sua sponte redact this evidence in the Interview and Report in the absence of an objection, much of the evidence is cumulative to the testimony at trial. As such, we cannot say there is a reasonable probability that, but for any error, the result of the proceeding would have been different. *See State v. Shepard*, 2009 S.D. 50, ¶ 16, 768 N.W.2d 162, 167 (citations omitted) ("Where inadmissible evidence admitted at trial is cumulative only and other admissible evidence supports the result, the cumulative evidence, though inadmissible, is nonprejudicial.").

**Sentencing**

[¶24.] Janes argues the circuit court abused its discretion by making its sentencing decision based upon its belief that Janes might be paroled early because of the court's experience with a prior, unrelated case. Additionally, Janes argues the circuit court abused its discretion by finding that the children would likely suffer from post-traumatic stress disorder (PTSD) without any evidence in the sentencing record to support such a diagnosis.

[¶25.] We review a circuit court's sentencing decision for an abuse of discretion. *State v. Klinetobe*, 2021 S.D. 24, ¶ 26, 958 N.W.2d 734, 740 (citation omitted). "Within constitutional and statutory limits, the trial courts of this state exercise broad discretion when deciding the extent and kind of punishment to be imposed." *State v. Rice*, 2016 S.D. 18, ¶ 23, 877 N.W.2d 75, 83 (citation omitted). "Consequently, 'a sentence within the statutory maximum [generally] will not be disturbed on appeal.'" *Id.* (citations omitted).

[¶26.] "[T]he sentencing court should acquire a thorough acquaintance with the character and history of the [person] before it." *Klinetobe*, 2021 S.D. 24, ¶ 29, 958 N.W.2d at 741 (citations omitted). "The sentencing court should have access to 'the fullest information possible concerning the defendant's life and characteristics. Information which should be available to the court includes general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record.'" *Id.* (citations omitted). "Courts should consider the traditional sentencing factors of retribution, deterrence—both individual and general—rehabilitation, and incapacitation." *Id.* ¶ 28, 958 N.W.2d at 741 (citation omitted). "[T]he sentencing court determines, on a case-by-case basis, which theory is accorded priority." *State v. Talla*, 2017 S.D. 34, ¶ 14, 897 N.W.2d 351, 355 (citation omitted).

[¶27.] In preparation for the sentencing hearing, the circuit court reviewed the presentence investigation report, victim impact statements, and character letters in support of Janes. The presentence investigation report discussed Janes's comments regarding the offense, family history, educational information, employment history, leisure and recreation, drug and alcohol use, mental and physical health, attitudes and orientation, and previous criminal record.

[¶28.] At the sentencing hearing, the circuit court recognized positive steps Janes had taken since committing the offense and predicted that he would continue to do so. Additionally, the court found that Janes had shown some remorse for his actions, but also believed Janes had minimized his wrongdoing by blaming others and failed to fully take responsibility for his actions. The court also discussed its

concerns about the impact on the victims and their fears of not being believed. The court noted that B.S. had requested a seven-year sentence in his victim impact statement and that such a punishment seemed appropriate. The circuit court further emphasized that the victims will likely be affected by Janes's actions for the rest of their lives.

[¶29.]     Interspersed within these appropriate sentencing considerations, the circuit court also speculated, "I would be surprised if [the children] don't have PTSD." Additionally, the court noted its frustrations with the penitentiary system and questioned whether Janes would actually serve the amount of time imposed by the court, stating, "[I]n a case out of White River, I sentenced a guy to seven years in the state penitentiary and he was back in White River in under 90 days on penitentiary approved house arrest . . . . So, I don't trust the penitentiary sentence system." In fashioning Janes's sentence, the court added:

> Well, as you've all heard me complain rather vocally, anything I give to this young man is not what I'm giving him because the rest of the system says no, we don't think so. We're going to put a bracelet on him, or we're going to kick him back out to White River in three months.
> . . .
> I'm giving him a fictional sentence, but I am going to sentence him to the penitentiary because I don't really trust the jail. And I frankly [] don't think six months in some sort of jail or modified jail gathers this.

[¶30.]     The extraneous comments by the circuit court about the children potentially suffering from PTSD and the penitentiary system are not based upon any facts or law presented at the hearing. While these gratuitous comments complicate our review of the sentence by the circuit court, it is not clear that any of

the comments impacted the court's sentence or actually played a role in its sentencing decision.

[¶31.] The circuit court's sentence of ten years with three years suspended was within the legislatively authorized maximum sentence. *See* SDCL 22-6-1(7). Further, the court inquired into many relevant facts about the physical abuse, the victims, and Janes himself in considering an appropriate sentence such that the court was well acquainted with the offense and Janes's character and history before imposing sentence. The court also noted some mitigating and aggravating factors. On review of the whole sentencing record, we cannot say the court abused its discretion.

### Restitution

[¶32.] Janes argues the circuit court abused its discretion when it imposed restitution for the future counseling expenses of the children because the expenses were arbitrarily imposed and unascertainable in amount and scope. Additionally, Janes argues the circuit court abused its discretion when it imposed restitution in the amount of $2,000 for Tanya's lost wages because the State failed to establish a causal connection between Tanya's damages and the crime. The State concedes that the circuit court did not order a specific amount for counseling and points out that the written judgment does not include the court's oral order of restitution for counseling costs.

[¶33.] A circuit court "has broad discretion in imposing restitution." *State v. Falkenberg*, 2021 S.D. 59, ¶ 55, 965 N.W.2d 580, 596 (citation omitted). "When a defendant contests the amounts requested, the State must produce evidence that

allows the court to be 'reasonably satisfied' that such restitution is proper." *Id.*

¶ 57, 965 N.W.2d at 596–97 (citation omitted).

[¶34.]     "It is well settled that the written sentence must conform to the court's

oral pronouncement." *State v. Washington*, 2024 S.D. 64, ¶ 50, 13 N.W.3d 492, 507

(citation omitted). "When there is a difference between the written and oral

sentences, we review the sentence 'under the premise that the oral sentence

controls.'" *Id.* (citations omitted). We rely on the written judgment only "if the oral

sentence is ambiguous[.]" *Id.* (citation omitted).

[¶35.]     At sentencing, the circuit court stated, "I'm going to order restitution

in the form of counseling for these two kids [B.S. and N.S.]. I don't know if [J.J.] is

even old enough to take counseling, but if he is, and if you find a program that

works, I will hold Mr. Janes responsible for those counselling [sic] costs." Because

the court's oral sentence unambiguously made Janes responsible for "restitution in

the form of counseling" for the kids, the oral sentence controls. The court also orally

ordered Janes to pay $2,000 in restitution to Tanya for lost wages, which was

included in the written judgment of conviction. Janes challenges both orders.

### a.     *Future counseling expenses*

[¶36.]     Here, the court's oral order for restitution to the children was for

future counseling expenses. SDCL 23A-28-12 provides, "Anyone convicted under

. . . § 26-10-1 *shall be required* as part of the sentence imposed by the court to pay

all or part of the cost of any necessary medical, psychological, or psychiatric

treatment, or foster care of the minor resulting from the act or acts for which the

defendant is convicted." (Emphasis added.) In *State v. Jones*, this Court

interpreted that statute to require the court to order a defendant convicted of abuse or cruelty to a minor under SDCL 26-10-1, "to pay for [the victims'] treatment costs under SDCL 23A-28-12[.]" 2016 S.D. 86, ¶ 9, 888 N.W.2d 207, 209. We have also recognized that a sentencing court may order a defendant to pay future counseling expenses based upon "SDCL 23A-28-2(3) [which] defines 'pecuniary damages' as 'all damages which a victim *could recover* against the defendant in a civil action arising out of the same facts or events, except punitive damages and damages for pain, suffering, mental anguish, and loss of consortium.'" *Falkenberg*, 2021 S.D. 59, ¶ 60, 965 N.W.2d at 597.

[¶37.] When sentencing a defendant to the state penitentiary, the circuit court must "set forth in the judgment the names and specific amount of restitution owed each victim." SDCL 23A-28-3. Further, the court must determine the limits of restitution at sentencing, as a defendant's "due process rights attach at the time of sentencing, when restitution is set, not . . . after sentencing. In setting restitution, '[d]ue process safeguards, however, include the need for finality.'" *State v. Holsing*, 2007 S.D. 72, ¶ 17, 736 N.W.2d 883, 887 (quoting *Commonwealth v. Wozniakowski*, 860 A.2d 539, 545 (Pa. Super. Ct. 2004)). The trial court's sentence must comply with due process protections "by informing the defendant of the restitution he faced at the time of sentencing." *Id.* (quoting *State v. Wolff*, 438 N.W.2d 199, 202 (S.D. 1989)). Allowing the State to bring a defendant back into court after sentencing for the purpose of "increasing restitution . . . after he was sentenced would unlawfully increase his punishment and violate due process protections." *Id.* (citations omitted).

[¶38.] In *Falkenberg*, we reversed a restitution order that required the defendant to pay "up to $40,000 for future counseling expenses for all three of the victim's family members" because the order was not supported by any evidence in the record or based on a request by the State. 2021 S.D. 59, ¶¶ 59–60, 965 N.W.2d at 597. We explained that the "circuit court's restitution order imposed arbitrary caps without specifying timeframes or mechanisms by which specific amounts to be reimbursed . . . to [the victim]'s family could be ascertained." *Id.* ¶ 62, 965 N.W.2d at 598. We then remanded the restitution order for an evidentiary hearing for the court to determine "a projected amount based upon evidence submitted to the court, or language setting forth the parameters or contingencies that must be met so that such amounts can be ascertained by a definitive point in time." *Id.* ¶ 63 n.20, 965 N.W.2d at 598 n.20.

[¶39.] At the time of sentencing, the children had not engaged in any counseling and no evidence was presented showing that any of the children would engage in future counseling. As a result, the circuit court did not identify a projected amount for these counseling costs or any parameters or contingencies allowing such amounts to be ascertained at a definitive time. Because the circuit court failed to order an ascertainable amount of restitution for the children's counseling costs, we reverse the restitution order and remand for a restitution hearing and any corresponding restitution order consistent with this opinion.

### b. *Lost Wages*

[¶40.] Restitution in criminal cases is governed by SDCL chapter 23A-28. "It is the policy of this state that restitution shall be made by each violator of the

criminal laws to the victims of the violator's criminal activities to the extent that the violator is reasonably able to do so." SDCL 23A-28-1. Additionally, under the South Dakota Constitution, a victim has "[t]he right to full and timely restitution in every case and from each offender for all losses suffered by the victim as a result of the criminal conduct[.]" S.D. Const. art. VI, § 29. This Court has held that "South Dakota's restitution statutes require a causal connection between a defendant's crime and a victim's damages." *State v. Joyce*, 2004 S.D. 73, ¶ 16, 681 N.W.2d 468, 471 (citations omitted).

[¶41.]      "Restitution" is the "full or partial payment of pecuniary damages to a victim[.]" SDCL 23A-28-2(4). "Pecuniary damages" are broadly defined as "all damages which a victim could recover against the defendant in a civil action arising out of the same facts or event[.]" SDCL 23A-28-2(3). A "victim" is "any person . . . who has suffered pecuniary damages as a result of the defendant's criminal activities[.]" SDCL 23A-28-2(5). Further, the South Dakota Constitution, in a case involving a minor victim, defines the term "victim" to "include[] any spouse, parent, child, sibling, or as designated by the court, grandparent, grandchild, or guardian." S.D. Const. art. VI, § 29.

[¶42.]      Tanya, as the parent of B.S., requested $6,514.96 in lost wages, reporting that she had taken 31 days of unpaid leave from work for meetings related to this case and to take care of the children when they were too anxious to go to school. Although Janes objected to Tanya's request for lost wages at sentencing, the State presented sufficient evidence to allow the court to be reasonably satisfied that such restitution was proper—including Tanya's victim

impact statement and payroll documentation—to find that Tanya was a collateral victim of Janes's crime, and to order Janes to pay $2,000 in restitution for Tanya's lost wages.

[¶43.] Additionally, the record supports the circuit court's determination that there was a causal connection between Janes's crime and Tanya's lost wages.* The record shows that Janes's crime of abuse or cruelty to a minor inflicted symptoms of anxiety on the children, which caused them to miss school days. Tanya claimed that she missed multiple work days related to these anxiety symptoms, as she had to take off work on the days the children missed school. On this record, the circuit court did not abuse its discretion in ordering Janes to pay $2,000 in restitution for those lost wages.

### Ineffective assistance of counsel on direct appeal

[¶44.] Janes argues he was denied his Sixth Amendment right to effective assistance of counsel at trial because his counsel failed to object to the admission of the Interview and Report that contained inadmissible hearsay and other act evidence. Janes argues his claim is proper for direct appeal because there is no

---

* In support of Janes's argument that there was insufficient evidence of a causal connection between Tanya's damages and the crime, Janes relies on *State v. Joyce*, 2004 S.D. 73, ¶ 16, 681 N.W.2d at 471, which is inapposite here. In *Joyce*, the defendant rear-ended the victim's vehicle, fled the scene, and was later apprehended. *Id.* ¶ 2–3, 681 N.W.2d at 469. The defendant pled guilty to leaving the scene of an accident and was ordered to pay restitution for vehicle damages and medical expenses. *Id.* ¶¶ 4, 7, 681 N.W.2d at 469. We reversed the restitution award because the victim's damages were not caused by his crime of leaving the scene of an accident. *Id.* ¶ 10, 681 N.W.2d at 469–70.

reasonable strategy that could account for failing to object to evidence the defense had already fought to exclude.

[¶45.] Normally, we do not review a claim for ineffective assistance of counsel on direct appeal. *State v. Thomas*, 2011 S.D. 15, ¶ 23, 796 N.W.2d 706, 714 (citation omitted). But even if we were to review the ineffective assistance claim on direct appeal, we have already determined that any error in admitting the hearsay and other act evidence in the Interview and Report was not prejudicial.

[¶46.] "[T]o be entitled to relief on a claim of ineffective assistance of counsel, a defendant must show both that his counsel provided ineffective assistance and that he was prejudiced as a result." *State v. Stevens*, 2024 S.D. 3, ¶ 31, 2 N.W.3d 372, 382 (citation omitted). We have held that the showing of prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984), "is the same as that required to establish prejudice under plain error review." *Neels v. Dooley*, 2022 S.D. 4, ¶ 15, 969 N.W.2d 729, 735. Therefore, our determination that the admission of the hearsay and other act evidence was not prejudicial precludes an ineffective assistance of counsel claim related to counsel's failure to object to this evidence.

### Conclusion

[¶47.] We affirm the evidentiary issues raised by Janes on plain error review. We also affirm the circuit court's sentence and restitution order for $2,000 in lost wages. We reverse the circuit court's order of restitution for the children's counseling expenses and remand for a restitution hearing consistent with this opinion.

[¶48.] SALTER, DEVANEY, MYREN, and GUSINSKY, Justices, concur.