#29287-aff in pt & rev in pt-JMK
**2021 S.D. 59**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                      Plaintiff and Appellee,

    v.

STEPHEN ROBERT FALKENBERG,              Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
YANKTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE CHERYLE GERING
Judge

\* \* \* \*

RALEIGH HANSMAN
CLINT SARGENT of
Meierhenry Sargent, LLP
Sioux Falls, South Dakota                      Attorneys for defendant and
    appellant.


JASON R. RAVNSBORG
Attorney General

CHELSEA WENZEL
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff and
    appellee.

\* \* \* \*

ARGUED
JANUARY 12, 2021
OPINION FILED **10/06/21**

#29287

KERN, Justice

[¶1.] A Yankton County jury found Stephen Falkenberg (Falkenberg) guilty of second-degree murder in connection with the death of Tamara LaFramboise (Tamara). The circuit court imposed a mandatory sentence of life in prison, costs of prosecution, and restitution. Falkenberg appeals his conviction, claiming that the court erred by denying his motion for judgment of acquittal. He also contends the court abused its discretion by denying his motion to exclude certain photographs and testimony regarding the post-mortem concealment and dismemberment of Tamara's body. He further claims the court erred in fashioning its order of restitution requiring him to pay future counseling costs and other expenses incurred by the victim's family members. We affirm the conviction but reverse the court's restitution order in part and remand for a new restitution hearing.

## Background

[¶2.] We set forth the facts admitted into evidence in the light most favorable to the jury's verdict. *State v. Huber*, 2010 S.D. 63, ¶ 2, 789 N.W.2d 283, 286. Tamara was the only child of Mary LaFramboise and the mother of two adult children. Tamara moved to Yankton, South Dakota, from New Mexico in 2016 to make a fresh start after struggling with an addiction to methamphetamine.[1] After she arrived in Yankton, Tamara met Falkenberg, and they began a romantic relationship.

---

1. Prior to living in New Mexico, Tamara obtained a degree in environmental biology from the University of California, Davis.

-1-

[¶3.]     Falkenberg, who was described by his step-daughter, Merissa Luetjen, as a six-foot tall, "physically powerful" construction worker,[2] had suffered a severe traumatic brain injury from a car accident in 1993 when he was 19 years old.  He recovered from the accident and operated his own successful construction business.  Falkenberg did not use drugs.  Tamara, however, was convicted of ingestion of methamphetamine in 2016 and placed on probation.  She was required, as a condition of her supervision, to submit to regular and random urinalysis to ensure her ongoing sobriety.

[¶4.]     The parties' relationship was tumultuous.  Falkenberg claimed this was the result of Tamara's methamphetamine use, which caused her to become irrational and violent on occasion.[3]  Conversely, Falkenberg portrayed himself as passive and non-violent when reacting to Tamara's physical assaults against him.  Falkenberg, however, had a brief encounter in 2017 with his former wife, Jennifer Becker, which was hostile enough that a law enforcement officer had to intervene and physically separate the two.

---

2.     Falkenberg's son, Sebastian, described his father as "using his hands for everything all the time" and that, for purposes of general contracting work, "instead of using hammers[,] he would just pound it in with his hand."

3.     Travis Peterson, a friend of Falkenberg, who testified that Tamara had a reputation in the community for being violent and irrational, once observed an argument between the two at Falkenberg's shop, where Tamara "wore herself out" hitting Falkenberg while he "[j]ust smil[ed] and laugh[ed] at her a little."  On another occasion, after Tamara had been arrested, Falkenberg visited her in jail to help her secure counsel.  During the visit, Falkenberg became frustrated with her and told her to "f***ing listen" and that he was "f***ing sick of her."

[¶5.]     On March 1, 2019, the day of her disappearance, Tamara was scheduled to finish her shift at work as a machine operator at a local manufacturing company in Yankton at 2:00 a.m. Just before midnight, Tamara gave her debit card to Javier Gonzalez, a coworker who was at the end of his shift and asked him to purchase beer for her from Walmart before liquor sales ended for the evening. Gonzalez ran the errand and placed the beer, the sales receipt, and Tamara's debit card in a male coworker's pickup. Because her phone was inoperable, Tamara borrowed a friend's phone around 1:30 a.m. to call her mother in New Mexico. Tamara and her mother were close and spoke on the phone nearly every day. Falkenberg arrived at 2:00 a.m. in his Ford F-250 pickup to take Tamara to her apartment across town, because her vehicle was in the shop. First, however, Falkenberg drove to Walmart at Tamara's request so that she could purchase an alarm clock. Walmart's surveillance video showed Tamara exiting the store and Falkenberg's pickup with an open truck bed driving by.

[¶6.]     Falkenberg dropped Tamara off at her apartment during the early morning hours and admitted to returning to her apartment several times that morning.[4] On his first trip to her apartment, he arrived at about 6 a.m. Falkenberg later explained to law enforcement that he knocked on the door and heard an alarm clock ringing. After receiving no answer, he left without making contact with her. Falkenberg returned a second time at approximately 8:15 a.m.,

---

4.    Tamara was on probation and required to report daily and submit to urinalysis testing when summoned. Because Tamara did not have a working phone, Falkenberg made calls for her to the call-in number to determine if she had been selected to test that day.

and, this time, Tamara answered the door and had coffee with him in her apartment. However, Falkenberg told law enforcement that Tamara became angry at him and demanded that he leave, which he did. Falkenberg claimed that this was the last time that he had contact with her. Randy Neuharth, Tamara's supervisor and the plant manager, testified that Tamara left work at 2:00 a.m. and never returned. He also obtained surveillance footage from the plant at the request of law enforcement, which showed Tamara getting into a pickup, later identified as Falkenberg's, at the end of her shift. Later on that same day, Friday, March 1, Tamara did not appear at the Humane Society, where she was scheduled to work.

[¶7.] Cindy Roberts, a convenience store clerk who knew both Falkenberg and Tamara, testified that Falkenberg filled his truck with fuel at the store on March 1 in the early afternoon. Roberts noticed that the truck bed was covered, which was unusual because Falkenberg normally had his dogs in the truck bed. Roberts also noticed that Falkenberg had a swollen right hand. When Roberts asked Falkenberg about his hand, he told her that he injured it by punching an icicle. Roberts's interaction with Falkenberg was recorded on a surveillance video and introduced into evidence. Falkenberg left Yankton and started driving towards Menominee, Michigan, where he had lived for a time. His half-brother, Paul Bramschreiber, still lived in the area and owned a farm nearby. Falkenberg's mother also lived in Menominee.

[¶8.] Later that evening, Falkenberg checked into a hotel in Tomah, Wisconsin, which is along the direct route from Yankton to Menominee. The road conditions were poor that night, with ice, snow, and wind. The hotel clerk who

checked Falkenberg into his room noticed that Falkenberg used his left hand to sign the paperwork because of his swollen right hand. Falkenberg had food delivered and was in the hot tub when it arrived.[5] The following morning, March 2, Falkenberg continued from Tomah towards Michigan.

[¶9.]        Later that day, after arriving in Michigan, Falkenberg sought medical assistance for his hand injury. During his first visit, medical records indicate that Falkenberg attributed his injury to punching an icicle. Falkenberg saw a second medical provider on March 4. During this second appointment, Falkenberg reported that he injured his hand when he braced for a fall on ice with a clenched fist. Ultimately, Falkenberg was seen by two physicians and an occupational therapist and had several x-rays taken of his hand before it was placed in a cast.

[¶10.]        Meanwhile, efforts to locate Tamara proved fruitless. Mary had unsuccessfully attempted to call Tamara on March 2. After that, she began text messaging Falkenberg in an effort to contact her daughter because she knew Falkenberg and Tamara were in a dating relationship. Falkenberg denied knowing where she was but explained that he and Tamara had a verbal disagreement at her apartment the morning of March 1 after he went to Tamara's apartment to tell her that "she didn't have to test[,]" but she told him to leave. Falkenberg blamed Tamara's actions on her "lack of sleep."

[¶11.]        Still unable to contact her daughter, Mary texted Falkenberg again on March 4 to ask if he had seen her. Falkenberg responded that he had not seen her

---

5.        The clerks' contacts with Falkenberg were also captured on a surveillance video which was introduced into evidence.

and that he had "[b]een dealing with doctors all day. Feel [sic] the other day and my finger hurt. It got swollen the hand so bad I had to go to the doctor. End up breaking two fingers so now I dealt with not a surgeon but bone doctor today." Mary understood the word "feel" to mean "fell." Mary subsequently asked, "[I]s she alive?" Falkenberg replied, "She was w[he]n I left" and asked Mary to keep him informed of where Tamara was.

[¶12.] Shortly after Tamara's disappearance, Mary contacted Tamara's son, Ronald Sedillo, Jr. (Ron), to check in on Tamara as Mary was becoming increasingly worried about Tamara's well-being. Ron had a spare key to his mother's apartment and searched for her there but could not find her. Ron continued to check her apartment twice per day and observed that a bag that Tamara routinely carried with her when she went out was still in her apartment.

[¶13.] Michael Leverich, a manager for an automotive sales and repair business in Menominee, testified that on March 4, Falkenberg came to his place of work. Leverich, who knew Falkenberg because he saw him a couple of times each year, talked to Falkenberg who said he was driving his mother's car. Leverich testified that Falkenberg was nervous and asked to use the business's garbage dumpster for a small amount of garbage that had accumulated in his mother's car while he had been using it for a few days. Reluctantly, Leverich allowed it, but did not observe what Falkenberg placed in the dumpster. At some point, Leverich contacted the Menominee County Sheriff's department about the incident.

[¶14.] Mary reported Tamara missing to Yankton-area law enforcement on March 5, 2019, because she had been unable to reach her by phone since March 1,

2019. The following day, Deputy Darren Moser interviewed Falkenberg, who had returned from Michigan and was working at his shop, to inquire about his last contact with Tamara. Deputy Moser noticed that Falkenberg had a soft cast on his right hand. He also noticed several baseball bats located in the corner of Falkenberg's shop that were covered in dust.[6] Deputy Moser left Falkenberg's shop and, with other officers, entered Tamara's apartment—which was only one block away. Nothing seemed suspicious to him at the time. He later testified that when he reviewed photos of the apartment that he took that day, they showed an overturned lamp in the room.[7]

[¶15.] Falkenberg continued to deny any knowledge of Tamara's whereabouts. As the investigation continued, Deputy Wuebben obtained surveillance video from Walmart and photographs of several people. Deputy Moser then returned to Falkenberg's shop and asked Falkenberg about a photograph of an individual, Javier, who had used Tamara's debit card to purchase beer. Falkenberg told Deputy Moser that he did not know him but said he was suspicious that Tamara could be involved with another man besides him and that "[m]aybe that's the male that she's going to see." Sebastian, Falkenberg's son, asked his dad if he had seen Tamara, to which he replied that he had "no idea" what happened to her.

---

6. Special Agent Josh Twedt with the South Dakota Department of Criminal Investigation testified that his department later recovered five baseball bats from Falkenberg's shop and that he observed them in an undisturbed state covered with dust. No bats were ever found in Tamara's apartment.

7. A few days later, on March 18, Special Agent Tyler Neuharth of the South Dakota Department of Criminal Investigation executed a search warrant of Tamara's apartment and found a small amount of what was later determined to be Tamara's blood on the west wall in the entryway of the apartment.

Likewise, Merissa, Falkenberg's adult step-daughter, sent Falkenberg a text after hearing that Tamara was missing to see if he knew where Tamara might be staying. Falkenberg responded that he could not "think about it."

[¶16.] On March 16, Gregory Thornson-Westby discovered the nude, tattooed torso of a small woman lying on top of the ice in the Little River (creek) near his home outside of Menominee, Michigan, after his sons alerted him that they saw a body down by the creek. The area is wooded and unpopulated. When Thornson-Westby went to the spot the boys identified, he saw the body on the ice right below the bridge over the creek. Thornson-Westby called law enforcement to report the body. Detective Jeff Brunelle of the Menominee County Sheriff's Office responded and saw that the body was decapitated and missing hands and feet. Detective Brunelle, who had received a bulletin from South Dakota mentioning a missing person with similar tattoos, tentatively identified the body as Tamara's.[8] Tamara's head, hands, and feet were never recovered. The body was located 1.4 miles from Falkenberg's half-brother's property.

[¶17.] The same day that Tamara's body was found, Falkenberg called his son Sebastian to arrange a meeting with Sebastian and Merissa at Merissa's house at around 10:00 p.m. During the meeting, Falkenberg explained that he needed to go to Michigan to speak to the police, but that he wanted to talk to them first. Sebastian testified that his father told them that he had confronted Tamara at her

---

8. During the timespan between March 6 and March 16, Yankton County Sheriff's Deputy Sergeant Steve Wuebben was looking for Tamara. Knowing that Tamara had a romantic relationship with Falkenberg who had family in Michigan, Sergeant Wuebben sent a missing person report to Menominee law enforcement on the chance that Tamara had visited the area.

apartment the morning of March 1. When he arrived, she was dressed up and there were empty beer cans in the trash. He asked if she was cheating on him. Falkenberg stated that they had argued and Tamara grabbed a bat, and then explained how he defended himself. On direct examination, Sebastian confirmed that his father told him that he pushed Tamara away and "[s]he hit the wall and that was it."

[¶18.]     Merissa testified that her step-father said that he confronted Tamara and accused her of cheating on him. Falkenberg admitted pushing her and knowing right away that Tamara was dead. Merissa asked if it was self-defense and her step-father told her that Tamara got a bat "that he was afraid of." When questioned at trial, Merissa acknowledged that when she testified at the grand jury on April 1, she did not tell them that her step-father said he was hit with a bat. Knowing that Tamara's body had been found in Michigan and was dismembered, Merissa testified that she asked her step-father, "[w]hat's with the cutting situation?" Merissa explained that Falkenberg said it involved Tamara's "identity." Merissa also asked about the whereabouts of the tools he used in the cutting. Merissa testified that Falkenberg left her with the impression that the tools were gone.

[¶19.]     On March 18, 2019, Falkenberg was arrested, detained, and subsequently charged by complaint with second-degree murder. South Dakota Highway Patrol Trooper Eric Peterson, who was also a volunteer cadaver-dog handler with the Brookings County K9 Search and Rescue and Canine Search Solutions, had his certified dog, Ninja, perform a "free-air sniff" of Falkenberg's

truck. The dog indicated positively to the presence of human remains near the driver's door at the seam of the truck where the cab and bed are joined.

[¶20.] In Menominee, Detective Brunelle and other law enforcement officers conducted a two-day search of the local landfill for the items Falkenberg placed in Leverich's dumpster. They recovered several pieces of clothing, including a yellow and gray Columbia coat, a black sequined hat, white pants, and a Harley-Davidson shirt. Tamara's friend, Jennifer Parmelee, testified that she occasionally sold Tamara clothing. Parmelee identified the Columbia coat and Harley-Davidson shirt at trial as items she sold to Tamara. Sydney, Tamara's daughter, testified that she was with her mother when she bought the black sequined hat from a thrift store and that the white pants were similar to a pair her mother wore.

[¶21.] The State captured two conversations on video between Falkenberg and his visitors at the Yankton County Jail. During a visit with his ex-girlfriend, Terri Thurman, on April 9, 2019, he mentioned that "Weird stuff uh, weird stuff happened in Michigan the other day . . . . Not good, not good at all huh, not good at all . . . [for] [m]e." Similarly, on the following day, Falkenberg told two friends during a jail visit that "they're doing some weird stuff in Michigan . . . . Oh we don't talk about it . . . . But it's uh not good."

[¶22.] Falkenberg was indicted by a Yankton County grand jury on April 1, 2019, for second-degree murder in violation of SDCL 22-16-7 and first-degree manslaughter in violation of SDCL 22-16-15(2). Prior to trial, Falkenberg moved to exclude evidence of Tamara's post-mortem dismemberment as irrelevant to his intent at the time of the incident and to the cause of her death. Moreover, he

argued the evidence was graphic and highly prejudicial. In response, the State argued that the evidence was relevant to prove Falkenberg's attempts to conceal the murder and prevent identification of the body. As to Tamara's manner of death and Falkenberg's intent, the State argued the evidence would be relevant to show that Falkenberg struck Tamara, instantly killing her, and it would show Falkenberg's motive for removing her head in concealing the crime. Further, the State argued that any "prejudicial effect of the evidence would not be by illegitimate means . . . ." The circuit court denied Falkenberg's motion.

[¶23.] The case was tried to a jury in Yankton on January 13–21, 2020. During its case-in-chief, the State called twenty-six witnesses to the stand, including forensic pathologist Dr. Adam Covach, orthopedic hand surgeon Dr. Richard Curd, family members, and law enforcement officers from South Dakota and Michigan. The State presented evidence showing Falkenberg was the last person to have contact with Tamara on March 1 and presented evidence regarding his actions after her disappearance.

[¶24.] An autopsy on Tamara's body was performed by Dr. Covach, chief medical examiner for Fond du Lac County, Wisconsin. Dr. Covach testified that his examination revealed that Tamara's body was frozen no more than two days after her death and dismembered after it was frozen. He formed this conclusion because the body, despite its missing parts, still contained blood in its vessels. After the autopsy, a sample of Tamara's blood was submitted for examination. The toxicology reports revealed that at the time of her death, Tamara had methamphetamine in her system in the approximate amount of 350 nanograms per milliliter and 41

nanograms of amphetamine. Dr. Covach testified that overdose deaths usually involve levels in excess of 1000 nanograms. After ruling out all natural causes, Dr. Covach listed the cause of death as "homicide by unspecified means." When asked if the methamphetamine in Tamara's system could result in death, he opined that "[l]evels this low are generally not fatal" unless the person had a vulnerable heart. Dr. Covach testified that Tamara's "heart was incredibly healthy."

[¶25.]     The State also called Dr. Curd, an orthopedic hand and microvascular surgeon, to testify as to his assessment of the injury to Falkenberg's right hand. Dr. Curd, who formed his opinion after reviewing the medical records and x-rays gathered from the treatments Falkenberg received in Michigan, testified that the metacarpals on Falkenberg's middle and ring fingers[9] were fractured. Dr. Curd explained the injury was "very common in physical sports injuries[,]" and was known as a "boxer's fracture or a fighter's fracture."

[¶26.]     When describing how the two middle metacarpals could fracture in this way, Dr. Curd explained that the injury was consistent with a fist impacting a stationary, solid object such as a jaw, cheekbone, chin, or forehead. In Dr. Curd's opinion, the injury was not likely caused by a strike from a bat, as that would result in a larger area of injury. When asked if the injury could be caused by punching an icicle, Dr. Curd agreed that it was possible but that the icicle would have to be very narrow, one dimensional, and robust to break the hand in this way. He agreed that

---

9.     Dr. Curd testified that the metacarpal bones make up the skeletal structure for the palm of the hand with the top of the metacarpal bone referred to as the knuckle.

it was also possible to break these bones by falling on ice when bracing with a clenched fist.

[¶27.]    Following the State's case, Falkenberg reserved the making of a motion for judgment of acquittal, later made and denied by the court, and Falkenberg proceeded with his defense. Although Falkenberg did not testify, he advanced his claim of self-defense through Merissa's testimony that Falkenberg told her he was afraid of a baseball bat that Tamara wielded during their confrontation on March 1. Falkenberg also countered the State's evidence regarding Tamara's cause of death. Dr. Leon Kelly, a forensic pathologist,[10] testified that Tamara died while in the beginning phase of acute methamphetamine intoxication and was under the influence of the drug at the time of her death. Because Tamara had methamphetamine in her system, he could not rule out a cardiac arrhythmia, stroke, or brain aneurysm as a cause of death. However, Dr. Kelly ultimately agreed with Dr. Covach's conclusion that the cause of Tamara's death was likely homicide by an unknown cause, but pointed out that not all homicides were criminal acts, such as in the case of a killing that occurs when a person acts in self-defense.

[¶28.]    Falkenberg also advanced his theory that he panicked after Tamara's death, and because of his prior brain injury, he was unable to consider options to summon aid and instead traveled to Michigan to dispose of her body. Dr. Rodney Swenson, a clinical neuropsychologist, assessed Falkenberg's psychological

---

10.    Dr. Kelly was also the chief medical examiner and elected coroner for El Paso County, Colorado. He was also board certified in anatomical and clinical pathology.

functions. Prior to forming his opinion, Dr. Swenson interviewed Falkenberg, performed a number of neuropsychological tests, spoke with those who knew Falkenberg including family members, and reviewed Falkenberg's medical records from the treatment he received after his car wreck. He testified that the 1993 injury caused massive trauma to Falkenberg's frontal lobe, which impaired his ability to "multi-task, think of alternatives, anticipate consequences," and his ability to problem-solve. Although Falkenberg was capable of managing his own construction business, Dr. Swenson testified that Falkenberg's impairment would worsen with age and would be more pronounced when under stressful situations.

[¶29.] At the conclusion of the evidence, the jury found Falkenberg guilty of second-degree murder, first-degree manslaughter (heat of passion), first-degree manslaughter (unnecessary killing), and second-degree manslaughter. The court sentenced Falkenberg on the second-degree murder conviction to life in prison without the possibility of parole. The court also awarded costs of prosecution and restitution to Tamara's family for counseling and medical expenses incurred and for prospective treatment necessary as a result of Tamara's death.

[¶30.] On appeal, Falkenberg raises three issues which we restate as follows:

1. Whether the circuit court erred in denying Falkenberg's motion for judgment of acquittal.

2. Whether the circuit court abused its discretion by denying Falkenberg's motion to exclude evidence and testimony regarding dismemberment.

3. Whether the circuit court's restitution order violated Falkenberg's due process rights and the separation of powers doctrine.

## Analysis and Decision

### 1. Whether the circuit court erred in denying Falkenberg's motion for judgment of acquittal.

[¶31.] "The denial of a motion for judgment of acquittal is a question of law we review de novo." *State v. Rodriguez*, 2020 S.D. 68, ¶ 54, 952 N.W.2d 244, 259–60 (citation omitted). "In measuring evidentiary sufficiency, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Patterson*, 2017 S.D. 64, ¶ 27, 904 N.W.2d 43, 51 (citation and quotation marks omitted). "If the evidence including circumstantial evidence and reasonable inferences drawn therefrom sustain a reasonable theory of guilt, a guilty verdict will not be set aside." *State v. Miller*, 2014 S.D. 49, ¶ 10, 851 N.W.2d 703, 706 (citation omitted).

[¶32.] Falkenberg was charged with and convicted of murder in the second degree in violation of SDCL 22-16-7, which provides that:

> Homicide is murder in the second degree if perpetrated by any act imminently dangerous to others and evincing a depraved mind, without regard for human life, although without any premeditated design to effect the death of any particular person, including an unborn child.

"In order to successfully prosecute a suspect for murder under this statute, the prosecution must prove that the Defendant's conduct established that he was acting with a depraved mind. This mens rea requirement involves less culpability than the element of premeditation required for first-degree murder." *State v. Harruff*, 2020 S.D. 4, ¶ 39, 939 N.W.2d 20, 30 (citations omitted).

[¶33.]     Falkenberg contends that insufficient evidence exists to support the jury's verdict that he killed Tamara with a "depraved mind." Falkenberg asserts that post-mortem acts, such as dismemberment, were used to "retroactively establish" an act evincing a depraved mind, and, therefore, the State's theory has no support in the record. In Falkenberg's view, his conviction "hinged on exploiting the dismemberment" and the jury was encouraged to conclude that "anyone who could dismember a body—despite such an act indisputably occurring post-mortem, days later, and without any connection to cause of death—must have had a depraved mind . . . ." Further, Falkenberg argues the State's theory that Falkenberg struck Tamara in the head hard enough to kill her in one blow did not rise to the level of an act evincing a depraved mind.

[¶34.]     In *State v. Hart*, we reaffirmed the principle that "[i]f a person is able to act with a lack of regard for the life of another, then that person can be convicted of second-degree murder." 1998 S.D. 93, ¶ 16, 584 N.W.2d 863, 866 (quotation marks omitted). Here, the court instructed the jury that conduct "dangerous to others" as used in the crime of second-degree murder, meant an act which was "inherently dangerous that puts the lives of others in jeopardy." The jury was further informed that in evaluating the evidence of depravity, it could consider not only the conduct itself but the circumstances of its commission.

[¶35.]     In response to Falkenberg's argument, the State relies on the direct and circumstantial evidence that Falkenberg struck a fatal blow to Tamara's body without regard for her life. Falkenberg was a six-foot tall, physically powerful construction worker with hands so strong he used them like a hammer. Tamara

was a small, petite woman. Falkenberg admitted to his children that he "pushed" her and knew right away that she was dead. We previously observed in *Miller*, a case cited by Falkenberg, that a father's "blows to the body or shaking, that eventually resulted in [his child's] death" were properly determined by a jury as acts committed with a depraved mind. 2014 S.D. 49, ¶ 29, 851 N.W.2d at 709. Likewise, as we recently held in *Harruff*, the deliberate use of force involving an imminently dangerous act, such as striking a person "in the chest with a force of a mule kick[,] evinces a lack of regard for [human] life . . . ." 2020 S.D. 4, ¶ 42, 939 N.W.2d at 31.

[¶36.] Because Falkenberg severed Tamara's head and disposed of it, purportedly to conceal her identity, the State argued that he did so to hide the evidence of his crime and the exact mechanism of the fatal blow. To support this theory that Tamara was killed by a punch to the head, the State presented abundant evidence regarding the nature and timing of Falkenberg's hand injury. Roberts, the convenience store clerk, spotted Falkenberg with a swollen hand just hours after his last visit with Tamara. She also noticed that he had placed a cover on the bed of his pickup truck which was usually left open to transport his dogs. Dr. Curd testified that the hand injury was a common injury for boxers and that a punch with a fist to a stationary object like a jaw, cheekbone, or forehead could cause such an injury. The jury could also consider Falkenberg's inconsistent explanations for his hand injury, attributing it to either a fall or a punch to an icicle. Without question, a blow to Tamara's face, with force sufficient to cause a

"fighter's fracture" on Falkenberg's right hand, evinces an indifference to human life and the depravity necessary to support a second-degree murder charge.

[¶37.] Although Falkenberg contends the State used his post-mortem acts to retroactively establish that he killed Tamara with a depraved mind, his actions in dismembering her body and disposing of her head were relevant not only to *how* he killed her but also to his resulting consciousness of guilt after their fatal altercation. The same day Tamara disappeared, Falkenberg began his 600-mile journey to Michigan in inclement weather with dangerous road conditions. Based on its investigation, the State argued that Falkenberg threw Tamara's body in the truck and drove to Michigan. A cadaver dog confirmed the scent of human remains in the truck. Detective Brunelle, who photographed Tamara's body after it was removed from the frozen creek bed, testified that he observed tool markings and horizontal striations on the bones where the head, hands and feet had been cut off. Dr. Covach confirmed that there were tool markings on Tamara's body, evident around the cut surfaces of the neck and forearms. The actual tools used to dismember Tamara's body were never found, and Merissa testified that when she asked Falkenberg his response led her to believe the tools used in the "cutting" were "gone."

[¶38.] About the same time that Tamara's clothes were discovered in the landfill in Menominee, Falkenberg told two persons visiting him at the jail that "weird stuff happened in Michigan" that was "not good at all" for him. The fact that Tamara's body was found 1.4 miles away from Falkenberg's half-brother's farm demonstrates a geographical connection between Falkenberg and Tamara's dismembered body. Furthermore, when asked by Merissa about the "cutting

situation" with Tamara's body, Falkenberg explained that it involved Tamara's identity.

[¶39.]    Falkenberg pled not guilty, and the State bore the burden of proving every element of the crime of second-degree murder. "All elements of a crime, including intent . . . , may be established circumstantially." *State v. Shaw*, 2005 S.D. 105, ¶ 45, 705 N.W.2d 620, 633 (citation omitted). "Direct and circumstantial evidence have equal weight. In fact, in some instances circumstantial evidence may be more reliable than direct evidence." *State v. Riley*, 2013 S.D. 95, ¶ 18, 841 N.W.2d 431, 437 (citations and quotation marks omitted). Here, the evidence presented by the State supported their theory of how Falkenberg murdered Tamara and the great effort he undertook to conceal his crime.

[¶40.]    "[A]fter viewing the evidence in a light most favorable to the [verdict], any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Tofani*, 2006 S.D. 63, ¶ 24, 719 N.W.2d 391, 398 (citation omitted). Based on our review of the record, the evidence is sufficient to support the conviction of second-degree murder, and the circuit court did not err by denying Falkenberg's motion for judgment of acquittal.

> **2.     *Whether the circuit court abused its discretion by denying Falkenberg's motion to exclude evidence and testimony regarding dismemberment.***

[¶41.]    The evidentiary rulings of a circuit court are presumed to be correct. *State v. Kihega*, 2017 S.D. 58, ¶ 20, 902 N.W.2d 517, 524. We review a circuit court's decision to admit testimony and photographs into evidence for an abuse of discretion. *State v. Quist*, 2018 S.D. 30, ¶ 16, 910 N.W.2d 900, 905. An abuse of

discretion is "a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *State v. Kvasnicka*, 2013 S.D. 25, ¶ 17, 829 N.W.2d 123, 127–28 (citation omitted). "Under the abuse of discretion standard, not only must error be demonstrated, but it must also be shown to be prejudicial." *Harruff*, 2020 S.D. 4, ¶ 14, 939 N.W.2d at 25 (citation and quotation marks omitted). "Prejudicial error is error which in all probability had an effect upon the jury's verdict and is harmful to the substantial rights of the party assigning the error." *Loen v. Anderson*, 2005 S.D. 9, ¶ 5, 692 N.W.2d 194, 196.

[¶42.]     Falkenberg challenges the admissibility of the testimony and certain photographs introduced at trial "showing [Tamara's] torso with attention focused on areas missing extremities." In Falkenberg's view, the evidence was irrelevant because it occurred "post-mortem, days later, and was not related to the cause of [Tamara's] death" and was unfairly prejudicial. Falkenberg argues that any relevancy was "outweighed by the danger of the jury confusing the issues" and that the "gruesome nature of dismemberment was guaranteed to inflame the jury['s]" emotions. Finally, Falkenberg contends that the evidence was so cumulative that it "contaminated the entire case"—depriving Falkenberg of his constitutional right to a fair trial. Falkenberg also points to the State's repetitive use of the word "dismember" or its derivatives as evidence of its prejudicial effect.

[¶43.]     Pursuant to SDCL 19-19-401, "[e]vidence is relevant if: (a) [i]t has any tendency to make a fact more or less probable than it would be without the evidence; and (b) [t]he fact is of consequence in determining the action." However, a

"court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." SDCL 19-19-403. The rule "favors the admission of evidence in the absence of strong considerations to the contrary." *Harruff*, 2020 S.D. 4, ¶ 17, 939 N.W.2d at 26 (citation omitted). "[E]vidence of flight or concealment immediately after the events charged in the indictment[ ] may be relevant to show consciousness of guilt." *State v. Stone*, 2019 S.D. 18, ¶ 26, 925 N.W.2d 488, 498.[11]

[¶44.] Here, the evidence of Falkenberg's efforts to conceal Tamara's identity and to permanently dispose of her head, hands, and feet were highly relevant. Her missing body parts could have provided valuable clues to the cause of her death and Falkenberg's role in causing it. Because neither Dr. Covach nor Dr. Kelly could determine the exact manner in which Tamara was killed, the dismemberment

---

11. The Ninth Circuit addressed this issue in two criminal cases involving dismemberment. "Evidence of post-mortem decapitation and dismemberment, thus of photographs depicting it, [are] relevant to show motive, premeditation, and consciousness of guilt; it tend[s] to show that [the defendant] needed to, and tried to, obscure the identity . . . ." *U.S. v. Mitchell*, 502 F.3d 931, 968 (9th Cir. 2007).

   In *Rivers v. U.S.*, 270 F.2d 435, 438 (9th Cir. 1959) (citations omitted), the court explained: "It is well settled that the conduct of an accused person following the commission of an alleged crime may be circumstantially relevant to prove both the commission of the acts charged to the accused and the intent and purpose with which those acts were committed. Among such acts are flight of the accused and concealment of the results of the crime. It is plain that the jury could well infer from the evidence in this case that the dismemberment of the body and the throwing of the portions into the sea were done to conceal a murder or to avoid its detection. This would be particularly true of the acts disposing of the finger tips. Such an act would serve the purpose of avoiding identification of the body."

evidence was relevant to prove the State's theory that Tamara was killed on March 1 by a blow to her now missing head. In support of this theory, the State presented evidence of Falkenberg's physical prowess and his broken fist, as well as testimony from his two children that he had admitted pushing Tamara against her apartment wall and that he knew right away that she was dead. Because Falkenberg further claimed he pushed Tamara in self-defense, the evidence showing that he disposed of her head supported a reasonable inference that he did so to conceal evidence that may have revealed the nature and extent of her injuries. Such evidence was relevant to refute Falkenberg's self-defense claim by showing his consciousness of guilt.

[¶45.] The dismemberment evidence was also relevant to show how the perpetrator of the crime attempted to conceal the identity of Tamara's body before disposing of it. Falkenberg admitted as much when Merissa asked him, "What's with the cutting situation?" According to Merissa, Falkenberg told her it concerned Tamara's "identity[.]" Further, Dr. Covach testified that upon examination of Tamara's body in the areas where it had been dismembered, the cut surfaces of the bone showed multiple parallel marks consistent with tool marks. This evidence was relevant to show that it could have been someone familiar with power tools, such as a contractor with Falkenberg's experience, ability, and strength, who made such cuts. The State also used the photos of Tamara's frozen body to support its theory that she was carried in the back of Falkenberg's truck 600 miles in cold, snowy weather before being dismembered.

[¶46.]     Falkenberg nevertheless argues that 15 of the State's 63 exhibits depicted dismemberment in a needlessly cumulative fashion causing unfair prejudice.[12]  However, it is well-settled that, "[i]f relevant, photographs are not rendered inadmissible merely because they incidentally tend to arouse passion or prejudice.  Autopsy photographs fall within these rules.  Although disturbing and cumulative, autopsy photographs may be admitted when they are necessary to aid in an expert's presentation of evidence." *State v. Hemminger*, 2017 S.D. 77, ¶ 33, 904 N.W.2d 746, 757 (citations omitted).

[¶47.]     Here, the photographs of Tamara's dismembered body were presented in conjunction with Dr. Covach's expert testimony.  He used the photographs to support and explain his testimony regarding the time of Tamara's death, the frozen condition of her body, when the dismemberment occurred in relationship to her death, the marks which resulted from the cutting tools used, and the tattoos ultimately used to identify her body.

[¶48.]     Dr. Covach referenced one photograph, Exhibit 33, while testifying that the skin on the body had a "purplish area," which was known as "marbling" or "livor mortis."  He explained that the "marbling," as depicted on the photo, was evidence of early decomposition which is helpful in determining the time of death.  Seven other photographs involved images of the different tattoos used to

---

12.     A review of the record shows only 14 photographs involved images of portions of Tamara's body.  The other photograph (Exhibit 32) depicted the identification tag affixed to the body bag.

conclusively identify Tamara's body (Exhibits 38–44).[13] Three photos (Exhibits 33–35) depicted the front and back of Tamara's body, providing an overview of the location of the identifying tattoos and the straight lines where her head, feet and hands were severed. Exhibits 36–37 depicted the tool marks evident across her neck and where one of her hands was severed.

[¶49.] The two remaining aerial photographs, Exhibits 22 and 23, depicted the location of where the body was found under the bridge on the ice of the frozen Little River. They were used to show that Falkenberg was likely the person who disposed of Tamara's body. Before the photographs were shown to the jury, Detective Brunelle, who took the pictures, testified regarding the remote terrain and the body's location in relation to Falkenberg's brother's farm as well as how the tattoos on Tamara's body aided him in identifying her. The photographs allowed the jury to infer that the body could have been easily thrown off the bridge from a vehicle onto the ice below without being detected, due to the remote, wooded area surrounding the creek.

[¶50.] Because the photographs at issue were admitted for distinct purposes, they were not unfairly cumulative or prejudicial. "[T]he fact that the photographs could arouse passion or prejudice does not compel the conclusion that the evidence should have been excluded." *Hemminger*, 2017 S.D. 77, ¶ 36, 904 N.W.2d at 758.

---

13. The photographic exhibits depicted unique tattoos found on different areas of the body: Exhibit 38 (the right forearm—playing cards); Exhibit 39 (the left shoulder—a cross); Exhibit 40 (the left forearm—a puma); Exhibit 41 (the upper left part of the back—an eagle on a branch); Exhibit 42 (the upper right part of the back—three hearts with wings); Exhibit 43 (the left ankle area—a spider web); and Exhibit 44 (the right calf—a banner).

"[B]ecause virtually all relevant evidence presented at trial is harmful to the other party," autopsy photographs must be unduly prejudicial before being excluded from evidence and "must persuade the jury in an *unfair* and *illegitimate* way." *Quist*, 2018 S.D. 30, ¶ 18, 910 N.W.2d at 906 (citation omitted). Here, the photographs, though gruesome, do not reflect an unfair or illegitimate presentation of the evidence. Moreover, to ensure proper consideration of such concealment and dismemberment evidence, the court gave a limiting instruction informing the jury that such evidence did not create a presumption of guilt.[14] Rather, the jury was instructed that they were not required to consider the evidence but could consider it along with all of the evidence in the case, giving to it the weight they felt it was entitled to receive. Therefore, the circuit court did not abuse its discretion in allowing the evidence, testimony, and arguments relating to dismemberment to be considered by the jury.

### 3. Whether the circuit court's restitution order violated Falkenberg's due process rights and the separation of powers doctrine.

[¶51.] At the sentencing hearing, the State sought to recover from Falkenberg $29,678.86 for costs of prosecution, restitution for expenses submitted by Tamara's family to the Crime Victims' Compensation Commission (Commission), and

---

14. The court instructed the jury that: "Concealment by the defendant does not create a presumption of guilt. If you find that the defendant dismembered the body of Tamara LaFramboise, or disposed of tools and Tamara LaFramboise's clothing, this evidence may be considered by you as a circumstance tending to prove the defendant's consciousness of guilt. You are not required to do so. You should consider this evidence in connection with all the other evidence in the case and give it such weight as in your judgment it's fairly entitled to received."

$2,191.65 to Sydney for medical costs stemming from her attempts at self-harm as a result of losing her mother.[15] In support of these requests, the State provided the court with receipts for prosecution costs, and documentation from the Commission reflecting that it had awarded compensation for expenses of $4,856.14 for funeral costs, $720 for transportation costs for Ron contingent on submission of mileage compensation forms, and approval for 18 "Mental Health" sessions for Sydney, contingent upon receipt of documentation from the provider within a set deadline of January 13, 2021.[16] The State also submitted a summary document detailing a total restitution request for the Crime Victims' Compensation Fund of $7,625.10, which included the $4,866.14 and $720 amounts awarded by the Commission, as well as a $1,480.96 request for a headstone and a $586 counseling bill for Sydney. The State did not provide receipts or documentation supporting these latter two amounts.

[¶52.] Falkenberg objected to the State's restitution requests, arguing that the State was required to submit documentation in support of these amounts. Because the documentation produced from the Commission showing what had been awarded did not contain the underlying invoices or other documentation supporting

15. The provisions of SDCL 23A-28B establish a Crime Victims' Compensation Commission, under the authority of the Department of Public Safety to pay, upon application, approved expenses for crime victims from a victims' compensation fund. The maximum compensation an individual claimant may receive is $15,000.

16. The State introduced a statement of expenses submitted to the Commission reflecting approval for 18 future mental health sessions for Sydney noting that she "would like to seek mental health services; however, no bills or provider information was provided to [the Commission]. Expenses will be pending."

such amounts, Falkenberg claimed that the State failed to meet its burden "to prove those costs did occur and were related to the incident in question." The court agreed with Falkenberg regarding the lack of documentation and ordered the State to provide "the billing statements themselves . . . that have been paid by the [Commission] or approved by and not yet paid before being ordered." The court observed that the Commission would not have authorized "payments without seeing the invoices themselves, so the invoices exist." The State assured the court that it would provide the underlying billing statements for these invoices.

[¶53.]        The court then denied Falkenberg's objections and awarded costs of prosecution and $2,195 to Sydney.[17]  Although not requested by the State, the court also ordered Falkenberg to reimburse the Crime Victims' Compensation Fund (Fund) up to $15,000 for expenses awarded on claims submitted by the family and additional restitution of up to $40,000 directly to Tamara's children or mother if they incurred counseling or medical expenses attributable to Tamara's death. Regarding the amounts ordered, the court stated, "[I]f there is any dispute, Mr. Falkenberg will have the right to a hearing after review of any documentation submitted in support of those requests either before this court or, again, more likely before the Department of Corrections [DOC]."[18]

---

17.   Falkenberg does not challenge these awards on appeal.

18.   The court's written judgment of conviction and sentence provides in relevant part that: "the Defendant Stephen Robert Falkenberg shall pay restitution to the Yankton County Clerk of Court's Office in the total amount of $29,678.86 to be paid to Yankton County for prosecutions costs; total reimbursement to Crime Victims' Compensation Fund of up to $15,000.00 upon proof of expenditure; $2,191.65 to Sydney Sedillo for counseling and total

(continued . . .)

[¶54.] On appeal, Falkenberg argues that the circuit court's restitution award to the Fund and the family was open-ended, speculative, and in contravention of SDCL 23A-28-3 and his due process rights. Additionally, he argues that because the sentence may result in a "reoccurring need for restitution hearings" and because the court told him these hearings could occur before the DOC, the court's sentence places him under the simultaneous supervision of the judicial and executive branches of state government, in violation of the separation of powers doctrine. Accordingly, Falkenberg argues that the circuit court lacked jurisdiction to fashion such a restitution order.

[¶55.] It is well established that the "[circuit] court has broad discretion in imposing restitution." *State v. Martin*, 2006 S.D. 104, ¶ 5, 724 N.W.2d 872, 874. However, whether the sentencing court complied with statutory standards relating to restitution involves issues of law which we review de novo. *State v. Bryant*, 2020 S.D. 49, ¶ 20, 948 N.W.2d 333, 338.

[¶56.] Restitution in criminal cases is governed by SDCL chapter 23A-28. "It is the policy of this state that restitution shall be made by each violator of the criminal laws to the victims of the violator's criminal activities to the extent that the violator is reasonably able to do so." SDCL 23A-28-1. SDCL 23A-28-3 provides

_____

(. . . continued)
reimbursement for counseling costs related to Defendant's crime up to $40,000.00 for Mary Laframboise, Sydney Sedillo and Ron Sedillo, which restitution is owed by [Stephen] Robert Falkenberg individually. If the Defendant disputes any portion of the $15,000 or $40,000 being paid, he has the right to request a restitution hearing. The $29,678.86 and $2,191.65 is not subject to further hearings as the court ordered those amounts to be paid."

in pertinent part that if the court sentences the defendant to the penitentiary, "the court shall set forth in the judgment the names and specific amount of restitution owed each victim." Thereafter, it is the role of the DOC to "establish the collection schedule for the court-ordered restitution while the defendant is in the penitentiary and on parole." *Id.* Here, the court's oral comments at sentencing, allowing for the possibility of a contested restitution hearing before the DOC, were erroneous. The DOC does not have the authority to set restitution, a function exclusively within the province of the circuit court, but it does have the responsibility to establish the collection schedule for court-ordered restitution. *See id.*

[¶57.] Defendants have a right to due process in criminal sentencing hearings involving restitution. *See State v. Tuttle*, 460 N.W.2d 157, 159 (S.D. 1990). While the rules of evidence and the civil burden of proof do not apply, the defendant generally has the right to "confront the victim's claims for pecuniary loss and also an opportunity to be heard." *Id.* (citation omitted). When a defendant contests the amounts requested, the State must produce evidence that allows the court to be "reasonably satisfied" that such restitution is proper. *Martin*, 2006 S.D. 104, ¶ 5, 724 N.W.2d at 874.

[¶58.] The evidence before the court here included the documentation of what the Commission had awarded, but the State did not produce, at the sentencing hearing, the underlying receipts, invoices, or other evidence supporting the award. Once defense counsel objected to the amounts being sought by the State for the counseling and other identified expenses requested by Tamara's family members, the circuit court should have set a restitution hearing. Although the court did

direct the State to obtain and provide to the defense the documentation underlying its request, it is well settled that Falkenberg had a due process right to a restitution hearing when he contested the restitution being requested by the State at the sentencing hearing. *See Tuttle*, 460 N.W.2d at 159.

[¶59.] While compensation for prospective counseling and medical costs may be appropriate and necessary in cases involving significant harm to victims and their families, the State's request for reimbursement for certain identified expenses submitted to and awarded by the Commission bore no relationship to the circuit court's award of up to $15,000 in reimbursement to the Fund. Even more problematic was the circuit court's sua sponte award of up to $40,000 for future counseling expenses for all three of the victim's family members—an award that was not based on a request by the State or supported by any evidence of record.

[¶60.] This is not to say that a court is prohibited from awarding restitution for amounts not yet incurred. On the contrary, SDCL 23A-28-2(3) defines "pecuniary damages" as "all damages which a victim *could recover* against the defendant in a civil action arising out of the same facts or events, except punitive damages and damages for pain, suffering, mental anguish, and loss of consortium." (Emphasis added). Further, SDCL 23A-28-2(5) defines a "victim" to include any person "who has by contract or by statute undertaken to indemnify another or to pay or provide *a specified or determinable amount* or benefit upon *determinable contingencies.*"[19] (Emphasis added).

---

19. The Legislature amended SDCL 23A-28-2(5) in 2021, but the amendments did not change the language quoted above.

[¶61.]     In *Holsing*, we considered the State's challenge to a circuit court's denial of the State's request to order a defendant, who had been discharged from parole, to pay additional restitution for a victim's counseling costs. 2007 S.D. 72, 736 N.W.2d 883. The restitution order entered by the court at the time of sentencing in 1998 did not identify the specific amount of restitution owed to the victims for counseling expenses. Rather, it provided that the defendant "shall make restitution in full to the victims for the costs of any counseling that said victims *may have incurred* as a result of said offenses." *Id.* ¶ 13, 736 N.W.2d at 886. When Holsing was released on parole in 2002, the Board of Pardons and Paroles set a restitution plan that required Holsing to pay the victim $5,709.25. Holsing paid the entire amount due while he was on parole and was discharged from parole in July 2004. In July 2005, the State applied for an order to show cause why Holsing should not have to pay an additional $190,768.83 in restitution to the victim. The circuit court dismissed the State's application, concluding that it lacked jurisdiction to order the additional restitution. On appeal, Holsing argued that in 1998 the court had only ordered him to pay restitution for past counseling costs, not future, and therefore, the court could not order him to pay additional restitution. *Id.* ¶ 10. We agreed, affirming the circuit court's determination that it no longer had jurisdiction to *increase* Holsing's restitution amount. *Id.* ¶ 18, 736 N.W.2d at 887.

[¶62.]     Relevant here is this Court's analysis in *Holsing* of the circuit court's restitution order entered at the time of sentencing. Although the court's order did not identify a specific dollar amount for the counseling costs, we explained that the trial court's sentence complied with SDCL 23A-28-3 because "[t]he victim's initials

[were] set forth in the sentence and *the amount of restitution was ascertainable.*" *Id.* ¶ 14, 736 N.W.2d at 886 (emphasis added). Importantly, therefore, under *Holsing*, a sentencing court may enter a restitution order at the time of sentencing that does not identify the specific amount of restitution owed for a victim's counseling, so long as such costs are ascertainable. However, here, the circuit court's restitution order imposed arbitrary caps without specifying timeframes or mechanisms by which specific amounts to be reimbursed to the Fund or to Tamara's family could be ascertained.

[¶63.] For the reasons explained above, we reverse the portion of the circuit court's restitution order requiring Falkenberg to pay up to $15,000 to the Fund and up to $40,000 to the victims for future counseling expenses and remand for an evidentiary hearing to address Falkenberg's objections to the State's requests. If the State submits adequate foundational evidence, the court may order Falkenberg to pay restitution for expenses that had already been incurred at the time of sentencing as well as the cost of ascertainable counseling expenses which, although not yet incurred, had been requested by the State at the time of sentencing.[20]

---

20. The Commission's approval of 18 mental health sessions for Sydney included a deadline of January 13, 2021, for the submission of necessary documentation from the provider. Such a directive creates a mechanism by which the specific amounts to be reimbursed to the Fund can be ascertained. Likewise, when a sentencing court orders restitution for future costs which have not yet been incurred, the restitution order should either include a projected amount based upon evidence submitted to the court, or language setting forth the parameters or contingencies that must be met so that such amounts can be ascertained by a definitive point in time. Any later disputes as to amounts owed may then be heard by the circuit court. This approach allows victims to obtain restitution as afforded under SDCL 23A-28-1 and

(continued . . .)

## Conclusion

[¶64.]    The evidence presented by the State was sufficient to sustain a conviction for second-degree murder.  Further, the circuit court did not abuse its discretion by permitting evidence of the dismemberment of Tamara's body because the evidence was relevant and neither cumulative nor unfairly prejudicial.  However, we remand for a restitution hearing and a corresponding restitution order consistent with the Court's directives herein.

[¶65.]    JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.

_____

(. . . continued)
    SDCL 23A-28-2, while at the same time meeting the requirements in SDCL 23A-28-3.